## In re Stolen.

*May 9—October 11, 1927.*

*Attorneys: Power of supreme court to discipline members of its bar: Judges of inferior courts: Good moral character as requisite: Accepting loans from persons engaged in crime: Knowledge of judge as to character of lenders: Disbarment as attorney: Petitions of strangers to record in supreme court.*

1. The power to discipline and disbar attorneys is an inherent power of the courts.  p. 610.
2. Secs. 1 and 13, art. VII, Const., relative to the impeachment of civil officers and the removal of judges of the supreme or circuit court, are inapplicable in determining the power of the supreme court to disbar the judge of the superior court of Dane county, in that it would also result in his removal from office as judge, since such superior court, which was created by ch. 136 of the Laws of 1917, and amended by ch. 56 of the Laws of 1919 and ch. 7 of the Laws of 1925, is not a constitutional court, so as to bring the judge thereof within the protection of the constitutional provision relative to removal from office.  [Whether said secs. 1 and 13, art. VII, Const., were intended to place any limitation upon the powers of the supreme court to discipline members of its bar, or whether the legislature may impose any limitations upon such power, are not decided, and no intimation or concession is made that the power is or may be thus limited.]  pp. 610, 611.
3. The requisite qualification, that one holding the office of an attorney at law shall be of good moral character, in so far as it relates to the discharge of the duties and responsibilities of an attorney at law is a continuing qualification.  p. 612.
4. The power or duty of this court to disbar an attorney at law on a showing of a lack of the necessary moral qualifications is not affected by the fact that such attorney may be a judge of an inferior court or be holding other public office.  p. 613.
5. If an attorney at law, by or through his acts as judge, betrays a lack of moral qualifications demanded of attorneys, it is the duty of this court to strike his name from the roll of its attorneys, notwithstanding his misconduct was in his character as judge and bore no relation to his duties and responsibilities as a member of the bar.  pp. 613, 614.

In re Stolen, 193 Wis. 602.

6. In disbarment proceedings wherein it was claimed that an attorney, while acting as judge of the superior court, borrowed money from notorious bootleggers who were brought before his court charged with violation of the liquor laws, testimony of the respondent that he did not know that those with whom he was dealing were bootleggers must be accepted as true unless outweighed by other facts and circumstances presented by the evidence; but the evidence is *held* to establish that respondent knew the character of the persons with whom he was dealing and should have known the reasons which prompted the loan, and to reveal a lack of requisite moral character and to require his disbarment. p. 618.

7. The supreme court has power to suspend attorneys for an indefinite period for disciplinary purposes and as a restraining influence upon others. p. 623.

8. A petition by members of the bar in the form of a brief *amici curiæ*, if deliberate and for the purpose of influencing the court, is improper, and if done thoughtlessly and without any consideration is not entitled to any weight. p. 624.
ESCHWEILER, J., dissents.

ORIGINAL JURISDICTION. Petition for disbarment. *Petition granted.*

The officers of the Dane County Bar Association presented to this court a document in the nature of an information relative to certain conduct of *Ole A. Stolen,* an attorney of this court, in his official capacity as judge of the superior court of Dane county. Upon considering the information the court concluded that the charges therein contained cast sufficient doubt upon the right of said *Ole A. Stolen* to continue as a member of the bar of this court to merit further consideration. H. H. Thomas, Esq., a member of the Dane county bar, was appointed by the court to investigate the matter set forth in the information, and to institute such further proceedings before the court looking to the disbarment of said *Ole A. Stolen* as such investigation might seem to warrant.

In due course a formal petition was duly prepared, setting forth facts to be hereinafter referred to, signed by the of-

ficers of said Dane county bar, and by said Thomas as prosecuting attorney, praying that this court exercise its original jurisdiction, and that an order to show cause be issued out of said court requiring the said *Ole A. Stolen* to show cause why he should not be disbarred from practice. Such order to show cause was duly issued and served, in response to which the said *Ole A. Stolen* moved that the complaint filed against him be dismissed, for the reason that the alleged acts complained of, as set forth in said complaint, if committed by the said *Ole A. Stolen,* were committed in his capacity as judge of the superior court of Dane county, Wisconsin, a court of record; that this court is without jurisdiction to try and determine the disbarment proceeding herein for the reason that such proceeding may result in the removal from office of a judge of a court of record who must be a member of the bar, and that the provision for removal from office of judges of the several courts of record as provided in the constitution of the state of Wisconsin is exclusive. This motion was denied by the court, without an opinion, and the said *Ole A. Stolen* was ordered to make answer to the allegations of the petition.

In due course said *Stolen* filed his answer, by which various issues of fact were raised. Thereupon this court appointed the Hon. A. G. Zimmerman, circuit judge for the Ninth judicial district, to take testimony upon the issues thus raised, and report the same to this court with all convenient speed. In due course the referee reported to this court the testimony taken pursuant to such appointment, from which it appears that in April, 1922, the respondent was elected judge of the superior court of Dane county, qualified as such, and was re-elected to the same position in 1926; that said court is a court exercising criminal jurisdiction throughout Dane county; that there is a section of the city of Madison popularly and variously known as "Little Italy," "Greenbush," and "The Bush," largely set-

tled by Italians, notorious for its bootlegging activities and other acts of lawlessness, six murders and two other shooting affrays having occurred therein during the year 1924, most of which are supposed to have been the result of feuds between rival gangs of bootleggers.

During the year 1923 the said respondent had entered upon the construction of a dwelling, the cost of the construction of which ran beyond his estimates, and along about January 1, 1924, he found himself in financial extremities. There was a prominent Italian living in "The Bush" by the name of Anton Navarro. He was a leader among the Italians, and almost invariably appeared in court with them, both state and federal, when they were charged with crime, acted as their adviser and arranged bail for them. Frequently he acted as interpreter. Respondent went to Navarro, stated his financial necessities, and asked for a loan. Navarro said he thought one LaBruzzo might make him a loan. Within a day or two Navarro arranged a meeting between respondent and LaBruzzo, and LaBruzzo loaned him $500 upon his unsecured promissory note. LaBruzzo was a notorious bootlegger. He so testified.

On August 5, 1922, respondent, as judge of the superior court of Dane county, conducted a preliminary examination in that court in a criminal action against LaBruzzo, wherein he was charged with violating the liquor laws, and after hearing the evidence respondent bound LaBruzzo over for trial, Anton Navarro furnishing LaBruzzo's bond. On the 16th day of December, 1922, respondent, as such judge, signed and issued a search warrant against LaBruzzo. The record shows that LaBruzzo had been in court upon criminal charges seven times in the three years preceding the loan and three times after said loan.

Sometime prior to June, 1924, respondent, as judge of the superior court, at the request of LaBruzzo, had committed the son of LaBruzzo, a juvenile offender, to a re-

formatory institution at Wauwatosa until the further order of the court. In June, 1924, LaBruzzo applied to the respondent for an order releasing the boy from the institution. By arrangement, respondent and his wife accompanied LaBruzzo and his wife to the institution, and respondent made an investigation, as a result of which he made and signed an order on the spot releasing the boy, and they took the boy home with them. Some criticism is made in the briefs of the fact that respondent made a court order while at the institution at Wauwatosa, but we give that matter no further consideration.

A few days later, and on the 2d day of July, 1924, respondent effected an additional loan of $600 from LaBruzzo. At this time he gave a note for $1,150 to cover the amount of the two loans. It will be noted that the amount of the two loans was $1,100 only. The reason for giving this note for $1,150 is not explained. Respondent testifies that when he asked LaBruzzo for the second loan LaBruzzo told him he was not sure he could make the loan, and referred him to his cousin Nick Randazzo, and that he wrote the name of Nick Randazzo in a book. LaBruzzo maintains he never mentioned Randazzo to the respondent.

On December 18, 1924, the respondent borrowed $500 from Nick Randazzo, giving his note therefor payable in six months from date. The proceedings leading up to this loan were as follows: Respondent referred to the address of Randazzo given to him by LaBruzzo. He walked down Regent street and located Randazzo's house. He saw a man outside and asked him if his name was Randazzo, and found out that it was. Randazzo called him Judge. After this introduction, respondent advised Randazzo that LaBruzzo had told him Randazzo might have money to loan, and thereupon requested a loan of $500, to which Randazzo replied, "I will let you know." A few days later Randazzo called respondent by telephone, saying that he would come

to his house with the money. Nothing was said about security, or the length of time the loan was to run. A day or two later Randazzo delivered the money and the respondent gave him his note. Respondent testified that when he was preparing the note he asked Randazzo as to the rate of interest, and received the reply, "O, it doesn't make any difference about interest."

On August 15, 1924, Randazzo had appeared before the respondent on a liquor charge, and upon preliminary examination conducted by respondent, Randazzo was bound over to appear at the circuit court. Randazzo admitted to police officers that he was a bootlegger, boasted that the officers could not catch him, and, in fact, they never did. The court records, however, show that on the 27th day of December, 1922, a search warrant was issued out of the superior court of Dane county, signed by the respondent, and returned "Nothing found;" that on March 5, 1925, another search warrant was issued, the return to which shows that some wine, but no distilled spirits, was found, and on August 15, 1924, he was bound over for trial by *Judge Stolen.*

Respondent next negotiated a loan from one Menderino, two or three weeks after the Randazzo loan was effected. Prior to applying to Menderino for a loan the respondent had met him but once: that was in front of Randazzo's house shortly after Randazzo loaned respondent the money. The conversation at this time related to Menderino's war record and had no reference to loans. Menderino lived in the same block with Randazzo, and respondent saw him one day as he passed along Regent street, and asked Menderino for a loan. He asked Menderino if he had money to loan, and the latter replied that he might have, and would let him know. Respondent asked for $800. No mention was made of interest or security. A day or two later Menderino called the respondent and, by arrangement, they met

at the latter's house, whereupon Menderino produced either $800 or $850 in money and respondent gave him his note. No questions were asked about respondent's financial condition or ability to pay, and respondent made no inquiries as to Menderino's business or occupation and claims to have known nothing about it. Respondent testified that he solicited this loan two or three weeks or perhaps a month after he obtained the loan from Randazzo. The record shows that on December 26, 1924, eight days after he borrowed the money from Randazzo, Menderino appeared before respondent as judge of the superior court charged with a violation of the prohibition law, and the case was afterwards dismissed for lack of evidence.

In 1925 both LaBruzzo and Menderino were brought before respondent charged with violations of the prohibition law. Respondent conducted a preliminary examination in the LaBruzzo case and bound him over for trial in the circuit court. Menderino pleaded guilty and was fined $400. LaBruzzo was convicted in the circuit court and sentenced as an habitual criminal and was in jail pending a motion to vacate the sentence. Up to this time neither *Stolen* nor LaBruzzo said anything to anybody about loans. While he was in jail LaBruzzo had the sheriff take him to respondent's office twice, where he demanded payment. Respondent promised to raise the money. LaBruzzo's son likewise demanded payment upon two different occasions at about this time. Respondent concedes that he was greatly humiliated by these visits to his chambers by a convicted bootlegger in the custody of the sheriff, and appreciated that if it became known it would undoubtedly lessen the respect for the court and for judicial officers. The sheriff told Phil LaFollette, then district attorney, that LaBruzzo claimed respondent owed him money, whereupon LaFollette questioned LaBruzzo in jail, and went to *Judge Stolen's* chambers, inquiring if it was true that LaBruzzo had loaned

respondent money, and upon receiving an affirmative answer, said to respondent, "My God, Judge, clean that up. No one can ever understand that." Respondent said nothing to LaFollette then about loans from Menderino and Randazzo, and LaFollette discovered their existence several months later through other sources. Respondent confirms this conversation and assigns as a reason for not telling LaFollette of the other loans that he knew LaFollette would make the matter public and use it against him the instant he knew it. He further testified, "I appreciated that my conduct was subject to censure, and if the public knew that I had been borrowing money from these men it would disgrace me and decrease the public esteem for the courts and judicial officers." Respondent never told any one about these loans except his wife. In August, 1926, he found out that the loans had become publicly known. Respondent says that he feared publicity, because the public could not understand how a sitting judge could become indebted to Italians of this district. He thoroughly appreciated this at all times and tried to keep the loans secret.

While Judge HOPPMANN was considering the sentence to be imposed on LaBruzzo, two police officers in conference with the respondent mentioned the fact that the district attorney entertained the opinion that LaBruzzo had been a gun man in New York and, therefore, recommended a severe sentence. These officers said that LaBruzzo was not a gun man, whereupon respondent said, "Somebody ought to let Judge HOPPMANN know that," and volunteered to communicate the information to Judge HOPPMANN, which he did. Respondent claims he was not influenced to intercede for LaBruzzo because he was indebted to him, although he had never conferred with Judge HOPPMANN before concerning sentence to be imposed on any other criminal in the circuit court. Respondent did not tell Judge HOPPMANN that he was indebted to LaBruzzo, and says, "I think he

knew it." He excuses the impropriety of his action by saying that he did not "stop to think at the time."

H. H. *Thomas* of Madison, for the petitioners.

*Frank W. Hall* of Madison, for the respondent.

The following opinion was filed June 20, 1927:

OWEN, J. As indicated in the statement of facts, respondent moved that the complaint filed against him be dismissed for the reason that the acts complained of, if committed at all, were committed in his capacity as judge of the superior court of Dane county, a court of record, and this court is without jurisdiction, as such proceeding may result in the removal from office of a judge of a court of record, and that the constitutional provision for removal of such officers is exclusive. The superior court of Dane county is not a constitutional court, having been created by ch. 136, Laws 1917, which was amended in certain particulars by ch. 56, Laws 1919, and ch. 7, Laws 1925. At all times the judge of that court was required to be a practicing attorney, duly admitted to the bar of Dane county, and the statute provided that he might be removed from office in the manner provided by the constitution of this state for the removal of judges of the circuit court. By sec. 1, art. VII, of the constitution it is provided that all civil officers may be impeached, and by sec. 13 of art. VII it is provided that any judge of the supreme or circuit court may be removed from office by address of both houses of the legislature. It was argued that these constitutional provisions for the removal of judges are exclusive, and that they can be removed in no other way, and that, as the disbarment of the respondent would make him ineligible to hold the office of judge of the superior court and result in his removal, this court had no power to act in the premises.

The power to discipline and disbar attorneys at law is an inherent power of courts. Whether the constitutional provision relating to the removal of judges was intended

as a limitation upon the power of courts to discipline, suspend, or disbar members of the bar, we are not called upon here to determine, for the reason that the constitutional provision invoked has no application whatever to the respondent. The constitutional provision relates to the removal of judges of the supreme and circuit courts only. The superior court of Dane county is a legislative creation. The legislature has seen fit to require the judge of that court to be a member of the bar of Dane county. It has seen fit, also, to provide the manner in which he may be removed, and in prescribing that manner it has merely adopted the method prescribed by the constitution for removal of the judges therein mentioned. The method of removal, however, is one prescribed by the legislature and not by the constitution. The respondent, therefore, was not within the protection of the constitution, and we are not now concerned with the question of whether the constitutional provision thus invoked was intended to place any limitations upon the power of this court to discipline the members of its bar. Neither are we called upon to determine whether the legislature may impose any such limitations upon this power (although it must be most emphatically understood that we make no such intimation or concession), for the reason that by the act creating the superior court of Dane county it has made no attempt to do so.

A number of cases are cited in the brief filed in behalf of respondent to the effect that courts have no power, or at least should not exercise the power, to disbar or suspend attorneys who hold public office, for official misconduct in such office, especially where such suspension or disbarment would result in a vacancy in the office. Some of the cases so cited and relied upon are *Matter of Silkman,* 88 App. Div. 102, 84 N. Y. Supp. 1025; *Matter of Strahl,* 201 App. Div. 729, 195 N. Y. Supp. 385; *State ex rel. Working v. Mayor,* 43 Mont. 61, 114 Pac. 777; *Baird v. Justice's Court,* 11 Cal. App. 439, 105 Pac. 259; *In re Cooper,* 12 Hawaiian,

124. But we do not find ourselves in agreement with the reasoning of those cases. One of the requisite qualifications for one who holds the office of an attorney at law is that he or she shall be of good moral character, in so far as it relates to the discharge of the duties and responsibilities of an attorney at law. This is a continuing qualification. It is a qualification necessary to entitle one to admission to the bar, and the loss of such qualification requires his suspension. The respondent is a member of the bar of this court. The charges preferred against him challenge his moral integrity. Just as it was the duty of this court to refuse him admission in the first instance upon a showing that he lacked the necessary moral qualifications, so is it its duty now to remove him upon like proof. *In re O*—, 73 Wis. 602, 619, 42 N. W. 221; *In re Richter,* 187 Wis. 490, 204 N. W. 492. The fact that he may be judge of the superior court, or that he may hold any other office, does not affect the duty or power of the court. He cannot take unto himself any office or position, or shroud himself in any garb, which will place him beyond the power of this court to keep its roster of attorneys clean. With the effect that will have upon his official station this court is not concerned. Its present concern is only that the act complained of discloses a lack of moral character constituting a continuing qualification to entitle him to remain a member of the bar of this court. If his suspension or removal as a member of the bar results in his disqualification for some other office, that effect is but incidental, and is due to the provisions of the law which make his office as an attorney at law a requisite qualification for such other office.

As already stated, whether the legislature may limit our power in this respect need not here be determined, because, as we construe the act creating the superior court of Dane county, it has made no attempt to do so. But it is apparent from the act that the legislature considered that the judge of that court should be a member of the bar. It did

that knowing that the certificate of such membership at-
tested not only to his legal ability but to his moral character.
This was also a continuing qualification. *State ex rel. Fu-
gina v. Pierce,* 191 Wis. 1, 209 N. W. 693. Just as this
court requires continuing moral character to entitle one to
retain membership in the bar of this court, so did the legis-
lature require membership of the bar as a continuing quali-
fication on the part of the judge of that court. From these
considerations it is plain that the fact that respondent was,
at the time the motion was made to dismiss, a judge of the
superior court of Dane county, does not interfere at all
with the power of this court to discipline him as a member
of the bar of this court, but rather that the exercise of
such power on the part of this court is in harmony with the
legislative purpose in requiring the judge of that court to
be a member of the bar of Dane county. This conclusion
is supported by *In re Burton* (Utah) 246 Pac. 188; *State v.
Peck,* 88 Conn. 447, 91 Atl. 274; *Hobbs' Case,* 75 N. H.
285, 73 Atl. 303; *State ex rel. Dill v. Martin,* 45 Wash.
76, 87 Pac. 1054; *In re Simpson,* 79 Okla. 305, 192 Pac.
1097; *State v. Hays,* 64 W. Va. 45, 61 S. E. 355; *In re
Norris,* 60 Kan. 649, 57 Pac. 528; *In re Breen,* 30 Nev.
164, 93 Pac. 997.

In response to the contention that the misconduct com-
plained of was misconduct in his character as a judge, and
bore no relation to his duties and responsibilities as a mem-
ber of the bar, we have only this to say: One's morality or
lack of morality is revealed by general conduct. One may
lack morality in a great many ways. Where this lack of
morality has no relation to, and does not affect, his duties
and responsibilities as an attorney at law, the delinquencies
are generally overlooked by the courts. But where there
is lacking honesty, probity, integrity, and fidelity to trusts
reposed in him, it matters not whether the lack of such
virtues is revealed in transactions with clients, in the con-
duct of lawsuits, or any other business dealings or rela-

·tions. These qualities are highly essential on the part of those who are to exercise the privileges and responsibilities of members of the bar. When the lack of them becomes apparent, no matter what the character of the deal or transaction that may furnish the evidence, it becomes the duty of the court to purge its roster of an unreliable member. So if the respondent, by or through his acts as judge of the superior court, betrays a lack of the moral qualifications demanded of attorneys at the bar, it becomes the duty of this court to strike his name from the roll of its attorneys. With these prefatory observations, we come now to an analysis and a consideration of his conduct as revealed by the record before us.

It is conceded that the respondent, while acting as judge of the superior court of Dane county, a court exercising criminal jurisdiction throughout the county, and before which court those charged with violations of the liquor laws were brought either for trial or preliminary examination, during the year 1924 made four loans from three notorious bootleggers. Not only that, but after making the loans he presided in court upon trials or preliminary examinations in cases brought against two of those from whom he had secured the loans. Respondent admits that this conduct was reprehensible and tended to bring courts and judicial officers into disrespect. That this constituted highly improper conduct is not controverted in the brief filed on the part of respondent. The defense of respondent is that he did not know that those from whom he made the loans were bootleggers. Whether this contention be true becomes very material and requires a careful consideration of all the evidence in the case. Under the established rule, the testimony of the respondent that he did not know that those with whom he was dealing were bootleggers must be accepted as true, unless outweighed by other facts and circumstances presented by the evidence.

The respondent is fifty-one years of age, was born in

Dane county, and graduated from the law school of the University of Wisconsin in 1905. Immediately after graduation he commenced the practice of the law in Mt. Horeb, Dane county, and continued in such practice until 1914, when he removed to Portage county and engaged in farming. In 1919 he returned to Madison, engaging in the practice of law in association with L. E. Gettle and A. T. Torge, and remained with that firm for a period of two years. In April, 1922, he was elected judge of the superior court of Dane county, and assumed the duties of that office July 3, 1922. From this it appears that during the greater portion of his life he was a resident of the vicinity of Madison, spent a number of years attending the University, presumably read the Madison papers, and must have been more or less conversant with matters of common knowledge and public affairs generally in that city. During the two years prior to his election to office he was a resident of, and in the practice of law in, that city. During this time it was a matter not only of common knowledge but of public notoriety that the portion of the city known as "Greenbush" or "Little Italy" was a center of lawlessness and bootlegging activities, and that conditions existing in that section constituted an outstanding civic and social problem in that city. This abundantly appears by clippings from the Madison press read into the record, showing, among other things, resolutions adopted by civic bodies in the city of Madison and published in the press calling attention to the public menace resulting from such conditions.

Before any of these loans were made, the respondent had served eighteen months as judge of the superior court, and during this time he had occasion to secure official information of the conditions existing in that district from the records of the court over which he presided. Indeed, his answer to the charges admits these conditions, but he further alleges that notwithstanding the fact that there was a large lawless element in this region, there abided therein

a large element of good, well-meaning, law-abiding citizens. In this connection it may be said that the pastor of the Italian church, testifying in behalf of the respondent, estimated that ten per cent. of the residents of that community were bootleggers, while Phil LaFollette, the district attorney of Dane county in 1925, testified that sixty per cent. of the dwellings of that community were places of bootlegging activities.    However that may be, no amount of credulity can exonerate the respondent of a knowledge of the general, lawless conditions of that neighborhood.    To impute to him a lack of that knowledge would be to accuse him of the most childlike simplicity.    Notwithstanding the fact that he was a most pronounced dry, when he became financially embarrassed he repaired to this neighborhood for financial favors.    He first went to Anton Navarro. Navarro was an outstanding, prominent citizen of that community.    He was above the average in intelligence among the citizens of that community.    Moreover, there is evidence that he was engaged in commendable activities tending to promote Americanization efforts in that community and to stimulate higher ideals on the part of his countrymen.    He was active in the work of a neighborhood house, an institution sponsored by civic societies in that community for the purpose of promoting Americanization work among the residents.    When he was shot he received praiseworthy notice from the press of the city.    Notwithstanding this, however, he was the friend and adviser of his fellow countrymen accused of crime, and, as stated, he was active in their behalf whenever they were brought into court accused of crime.    It cannot be doubted that he was in close touch with the affairs of his community and was well acquainted with the character and business activities of those residing in this section of the city, and was the friend and adviser of the criminal classes.    It was to Navarro that respondent went when he found himself in financial extremities.    Navarro

promptly arranged a loan for him from LaBruzzo. La-Bruzzo ranked among the first ten bootleggers in that community. He had a prolific court record. There was no difficulty in promptly arranging a loan from LaBruzzo to the respondent of $500 upon respondent's unsecured note, without any investigation as to his financial responsibility, without any questions asked, and without any interest demanded. When respondent asked LaBruzzo about interest, LaBruzzo said, "Never mind about interest," a remark which also was made by Randazzo and Menderino when he borrowed money from them.

We have, then, one who is known throughout the community as a pronounced dry, repairing to the notorious bootlegging section of the city for the purpose of securing a loan, and promptly obtaining it, from a bootlegger with a long court record. The personal relations existing between LaBruzzo and the respondent would not induce the loan. They were not friends. According to the testimony of the respondent they were not even acquaintances. He claims that he did not even recognize LaBruzzo and did not identify him as one who had been in his court on prior occasions. Their pronounced attitude on the liquor question was diametrically opposite. The sentiments entertained upon that question by the respondent were inimical to the welfare of LaBruzzo. Whatever the respondent knew about LaBruzzo, it may be assumed that LaBruzzo knew a great deal about respondent and about his views upon the liquor question. The loan cannot be accounted for upon the ground that it was prompted by personal relations or relations of friendship. Neither can it be accounted for on the ground that it was a business transaction. The loan was sought by respondent only after he had exhausted his credit with the banks, according to his own testimony. If any examination was made concerning the responsibility of respondent, the result must have been adverse to the loan.

Whatever prompted the respondent to seek the loan, there can be no doubt as to the motives which prompted LaBruzzo in making the loan. He did it in the hope of intruding himself into the graces of a public official with whom his record shows he had occasion to come in frequent contact. This conclusion seems too plain to call for much further discussion or elucidation.

But it is said that no matter what considerations prompted LaBruzzo to make the loan, the respondent had no thought that the loan so made by LaBruzzo was prompted by any such motives. This contention does scant justice to the intelligence of respondent as a man of public affairs. The circumstances already recited are sufficient to put simplicity itself upon its guard. It is impossible that the respondent should have thought that the loan was made from considerations of friendship or that it was made as a business transaction. When he went to "Greenbush" to negotiate this loan he knew that he was going into the very heart of the lawless element of the community. He knew that this community was not settled by men of wealth. He knew that the people of that community were either common laborers, small shopkeepers, or bootleggers, and he knew or should have known, or should at least have suspected, that the only men in that community who were likely to have money to loan were those engaged in the bootlegging business. He says that he did not know LaBruzzo, did not know that he was a bootlegger, and had no thought that he was prompted to make the loan in the hope of official favor. These statements certainly tax one's credulity and betray a simplicity little to be expected from one who had had the opportunities of the respondent for observation and information concerning men and affairs in his immediate locality. We are forced to the conclusion that respondent knew the character of the persons with whom he was dealing, and that he should have known the reasons which prompted the loan.

It is unnecessary to review the history of the other loans. They were made under similar circumstances and with the same character of'people.

We come now to consider the question of the consequences of these transactions as bearing upon the right of respondent to retain his certificate of admission to the bar. It may be conceded that as an ordinary citizen he had a right to borrow money from these men. It may be conceded that as a mere practicing attorney he would have had the same right. But he was not only an attorney. He was a judge of a criminal court before which these men were likely to be haled at any time and before which two of them were brought and over whose cases he presided after the making of these loans. The character demanded of an attorney at law includes the strength and stamina to act in accordance with recognized propriety under whatever circumstances he may find himself. The respondent knew that his position as judge carried with it a limitation upon his freedom of action not imposed upon the ordinary practicing attorney. There are many things which he might do with propriety as a practicing attorney which would be highly improper while occupying a judicial position. Unless one has the strength of character to resist temptations to do those things which are prohibited to a judge, then he does not have that moral character which is demanded of an attorney at law. The transactions which we are discussing reveal a lack on the part of the respondent of that degree of moral character.

We now come to consider the gravity of the offense. The action we shall take depends upon that. The respondent was a judge of a court of record. The court over which he presided constituted an important part of the machinery established by the State for the maintenance and the administration of justice. This is one of the great purposes of organized society. In the last analysis it is probably the

ultimate end of government.    As once said by Mr. Chief
Justice WINSLOW:

"Equal and exact justice has been the passionate demand
of the human soul since man first wronged his fellowman;
it has been the dream of the philosopher, the aim of the
lawgiver, the supreme endeavor of the judge, the ultimate
test of every government and every civilization.    Pain and
suffering may be bravely met, poverty and want endured
without complaint, the daily round of exacting toil taken up
with cheerful heart, but the soul of man in all ages has
bitterly cried out against injustice and insistently demanded
that it must not be.    Every government past and present
may be known and properly judged by the quality of the
justice administered by its courts.    The nearer the approach
to ideal and perfect justice in the courts, the nearer the
approach to Utopia in the government."

The absolute impartiality on the part of those who pre-
side over the court is a quality which a common sense of
propriety universally demands.    He who presides over a
court should be insensible to every influence except that
which has a legitimate bearing upon the matter pending
before him.    Neither bias nor prejudice should animate the
decision of a court.    Every system of jurisprudence scrupu-
lously provides a suitor with a trial before an unprejudiced
judge.    A prejudiced judge is abhorrent to settled notions
of justice, and nothing tends to bring courts or the admin-
istration of justice into disrespect more than the spectacle
of a prejudiced judge sitting in judgment upon the rights
of litigants.    A lack of confidence in the integrity of courts
rocks the very foundations of organized society, promotes
unrest and dissatisfaction, and even encourages revolution.
For many years the integrity of the courts of this state
has not been questioned.    They have enjoyed the confidence
of the people to a marked degree.    Not since the impeach-
ment of Hubbell have the courts been the subject of scandal
nor the target of the poisoned darts of slander.    One sitting

In re Stolen, 193 Wis. 602.

as a judge who voluntarily places himself under obligation to the criminal element of his judicial district, even though that obligation be merely that of debtor and creditor, and who sits in judgment upon the case of his debtor, shocks the public confidence in his court and tends to bring the general administration of justice into disrepute. This is the nature of the respondent's offense. It is very similar to the conduct of Lord Bacon, who took gifts from suitors and decided their cases against them, and for which he was sentenced by the House of Lords to undergo a fine and ransom of forty thousand pounds; that he should be imprisoned in the Tower during the King's pleasure; that he should be forever incapable of any office, place, or employment in the state or commonwealth, and that he should never sit in parliament or come within the verge of the court. It has never been shown that Lord Bacon's judgments were corrupted by these bribes. He evidently decided impartially the cases pending before him notwithstanding the bribes which he received from the suitors. It is claimed that none of his judgments rendered in such cases were reversed, but, notwithstanding this, Lord Bacon himself in later years said: "I was the justest judge that was in England these fifty years, but it was the justest censure in parliament that was these two hundred years."

Cheerfully would we adopt the view improperly intruded upon this court in the guise of a brief *amici curiæ,* permission to file which was asked upon the oral argument, signed by sixty practicing lawyers of the Dane county bar, to the effect that as the respondent has resigned his office he has suffered sufficient punishment, but to do so would be to shirk grave responsibility. The surrender or forfeiture of his office as judge of the superior court was a natural and just result of his misconduct as judge of that court. But the conduct which he recognized had destroyed his usefulness as a judge and deprived him of the right to continue

in that office must still be considered in connection with his right to continue as a member of the bar of this court. Conduct which calls for the resignation of a judge must forcibly challenge the fitness of one guilty of such conduct to continue to serve as a minister of justice in the capacity of an attorney at law.

It may be argued, and no doubt will be argued, as it was quite likely considered by the sixty members of the bar who petitioned this court for leniency in respondent's behalf, that prior to the incidents in question he had borne a good reputation, that he was induced to this misstep by reason of pressing financial circumstances, and that these acts of delinquency do not betray an inherent immoral character. To our minds it betrays the same weakness of character that prompts a bank officer to appropriate the funds of the bank with the hope and in the sincere belief that he will be able to restore the funds before the abstraction is detected. Such individuals generally have the sympathy of the public, but the stern policy of organized government demands that such conduct shall be punished. The laws made to fit such cases stamp such conduct as immoral. He who is thus guilty cannot longer protest that he is a man of good moral character. He betrays a weakness of character which renders it extremely dangerous to continue him in positions of trust calling for honesty, fidelity, and integrity. Such qualities are pre-eminently demanded of members of the bar. These considerations alone call for the disbarment of the respondent. But there are other considerations which lead to a like disposition of this matter.

Ever since the decision in the case of *Ex parte Wall,* 107 U. S. 265, 2 Sup. Ct. 569, courts have expressed the view that the disbarment of attorneys is not for the purpose of punishment but to protect the public and the courts from those who are unfit to be charged with the responsibilities of such office. This statement is made in that case,

but the punishment therein referred to was punishment for the crime committed. In that case Wall was a member of a lynching mob, and it was said that his disbarment did not constitute punishment for his crime, and that, notwithstanding his disbarment, he was still amenable to criminal punishment. We consider that courts have the power to discipline the members of the bar, and whether they say so or not they are continually exercising the power to disbar for that very purpose. If this be not so, it is difficult to justify the suspension of an attorney for a limited period of time. If the only purpose of exercising the disbarment power be to protect the public and the court from dishonest lawyers, then in all cases the judgment should be permanent disbarment or for such a length of time as to give some reasonable hope for moral regeneration. This cannot take place in six months, a year, or two years, and yet suspensions for such periods of time are common. We consider that suspensions of this character can only be justified on the ground that they are for disciplinary purposes and to act as a restraining influence upon others. This is a legitimate purpose to be accomplished by the exercise of all disciplinary power, and we shall now consider the proper disposition of this matter under this construction of our powers.

Respondent's offense is one against the administration of justice. His offense has brought courts and the administration of justice into disrepute. Our disposition of this matter will give character to that offense. It will stamp it either as a serious offense or one lightly to be passed over. This is a responsibility not often devolving upon courts. Offenses against society are generally classified by the legislative branch of government by the penalty provided for the commission of such offenses. In dealing with this matter we do not have the benefit of a legislative characterization of the gravity of this offense. In this case the prerogatives of sovereignty to give character to such offenses must

be exercised by the court.   To excuse this offense, or to pass it by with mere censure, we feel sure would be to shock public conscience.   The public would not very long retain confidence in their courts if the courts themselves regarded such conduct on the part of judicial officers lightly. Any disposition of this case which might be construed as a condonation of respondent's offense would be scarcely less culpable than the offense itself.   Serious offenses against the administration of justice on the part of ministers of justice should meet with stern and resolute action on the part of courts.   To suspend an attorney for six months or a year for culpable misconduct amounts to little more than a condonation of such an offense, and illy serves to check the drifting of the bar away from the traditional ideals of the profession, which, recent revelations show, is becoming quite alarming in our state.

We consider that upon two grounds the judgment of this court must be as hereinafter pronounced: first, the offense of respondent betrays a lack of moral stamina and, therefore, a lack of moral character, which renders the respondent an unfit person to hold the office of attorney at law; and second, the offense is of so grave a character as to call for serious treatment not only as a matter of discipline to the respondent but for its restraining influence upon others.

Before bringing this opinion to a close we deem it necessary to refer to the conduct of the sixty members of the Dane county bar who, in effect, sought to influence the action of this court by way of petition.   Their manner of approach was no less that of petition because it took the form of a brief *amici curiæ*.   The brief itself did not pretend to examine or analyze the evidence, and, so far as a discussion of the law was concerned, it did no more than to cite a few cases upon the most fundamental propositions. If this was done deliberately and with the purpose of influencing the court, it was reprehensible.   If done thoughtlessly and without any consideration, the opinions of these

members of the bar are entitled to no weight, and, at any rate, this method of influencing the court falls within the condemnation of *State ex rel. Rodd v. Verage,* 177 Wis. 295, 330, 187 N. W. 830. If sixty members of the bar may thus petition the court with reference to matters pending before it, then sixty plumbers cannot be denied the same privilege. This so-called brief *amici curiæ* has not been received or filed. It will not be. The clerk is ordered to return it to those who presented it.

*By the Court.*—It is the judgment of the court that *Ole A. Stolen* be, and he hereby is, disbarred from practicing law in this state, and his name is hereby stricken from the roll of attorneys of this court: with the privilege, however, of making application for reinstatement as such attorney at law after five years from the date of the filing hereof.

The following opinion was filed June 24, 1927:

ESCHWEILER, J. (*dissenting*). I agree with the conclusion embodied in respondent's admission and the majority's opinion that respondent's conduct was improper and reprehensible and have nothing to say in palliation.

The head and front of respondent's offense is something he did while holding a judicial position. The loans he made are declared tainted because so made. The judicial office he held was one of legislative creation, and attached to it, at its birth, were express legislative provisions for his removal or punishment for any derelictions as such judicial officer. He held such office and performed its duties by virtue of and only through such legislative action and the vote of the people. That court being a creature of the legislature, that body has plenary power over it. *State ex rel. Martin v. Kalb,* 50 Wis. 178, 188, 6 N. W. 557. He did not acquire or hold it as an officer of the courts, as attorneys as such are declared to be. *Hepp v. Petrie,* 185 Wis. 350, 358, 200 N. W. 857. The distinction

between his acquiring and holding his judicial office and his acquiring and holding his right or privilege as an attorney at law appears to me to be clear and distinct and the cleavage sharp.   As judge he holds a public office, and is clearly a public officer under the rule declared as early as *Hall v. State,* 39 Wis. 79, 86, even though he may not be of the more limited class of "public officers" referred to in sec. 26, art. IV, Const., whose compensation, during his term, cannot be changed, as pointed out in *State ex rel. Martin v. Kalb,* 50 Wis. 178, 183, 6 N. W. 557, *supra.*   Even though *Hall v. State, supra,* was reversed in 103 U. S. 5, it was only because of a different view being there taken upon the facts, and the general rule announced by this court was not there changed and is still bowed to as authority. *In re Appointment of Revisor,* 141 Wis. 592, 608, 124 N. W. 670.

The distinction here presented between respondent as a judicial officer and respondent as an attorney at law, who, as an officer of this court, is therefore amenable directly to it, is more sharply defined and outstanding than is the distinction recognized at common law and up to the present time between the dual functions of the same individual when a judge at chambers and when on the bench as a court. *In re Remington,* 7 Wis. 643, 655; *In re Kindling,* 39 Wis. 35, 59; *Wisconsin Industrial School v. Clark County,* 103 Wis. 651, 663, 79 N. W. 422; *State ex rel. Hazelton v. Turner,* 168 Wis. 170, 174, 169 N. W. 304.

For these reasons I think that this court, even conceding that under its supervisory powers or otherwise it might have had jurisdiction, yet that it ought not to have proceeded, and that respondent's plea to the jurisdiction should have been sustained.

I cannot agree with the majority as to the sentence pronounced.   I think it is too severe and harsh.

Having read the body of as well as the signatures attached to that which is designated as a petition, signed by sixty members of the Dane county bar and which is swept from

our records, I cannot join in the crashing condemnation of it as expressed by the majority. I most certainly do not join in any suggestion that those sixty gentlemen, or any of them, were doing anything "reprehensible." I find nothing of a dictatorial or offensive nature in it. It was open and above board, and even were it presented under a possibly mistaken view that one of our fundamental doorsteps, viz. sec. 4, art. I, Const., providing: "The right of the people . . . to petition the government, *or any department thereof,* shall never be abridged," permitted such to be done, that mistake, if mistake it was, conveyed, to me at least, no sinister suggestion. I think that this department of the government might well have allowed it, without sob or sound, to drop into the oblivion to which it is so vigorously consigned. Whether, within the somewhat rarefied atmosphere of these judicial chambers the two professions—of law and of lead, —the lawyers and the plumbers,—are to be held to have equal privileges of approach, I expressly refrain from declaring my humble opinion.

STEVENS, J., took no part.

A motion for a rehearing was denied, without costs, on October 11, 1927.

The following opinion was filed November 8, 1927:

OWEN, J. In the opinion in this case reference was made to a brief *amici curiæ* presented to this court by sixty members of the Dane county bar. This brief was treated as a petition to the court. The effort thus to influence the court was disapproved. Filing of the brief was denied. Thirty-one of the original signers now petition the court to reconsider what was thus said with reference to that matter.

In our original treatment of the subject our only doubt was whether we should consider the brief as a petition. Having arrived at the conclusion that the brief was no more

than a petition addressed to the court urging a certain disposition of a cause then pending, we considered the correctness of our disposition of the matter as obvious and indulged in no elaborate discussion of the subject.    The brief and petition now presented, however, frankly admits that the so-called brief *amici curiæ* was in effect a petition, was intended as a petition, and strongly maintains that the members of the bar signing it were well within their rights; that it should have been received by the court, and that the language of the court in disapproval of the practice should be withdrawn.

We cannot doubt that these contentions are sincere.    If it be true, as appears to be believed by a considerable number of the bar, that a court may thus properly be approached, we think that the question may well be re-examined, for the purpose of promoting an understanding between the court and the bar and a continuance of that confidence and respect which should characterize their relations.    In this spirit we cheerfully undertake to review the considerations which, it appears to us, make the conclusion announced in the main opinion imperative.

First, we should have in mind a thorough understanding of the status of the proceedings in which the petition was filed.    The jurisdiction of this court had been aroused by a petition presented to this court signed by the officers of the Dane County Bar Association calling attention to certain practices indulged by *Judge Ole A. Stolen* which reflected upon his right to continue as a member of the bar of this court.    The court received the petition, considered the matters therein set forth, and concluded that the facts presented called for an investigation.    An answer to the petition was required, which answer raised questions of fact.    The issues thus raised were referred to a referee for the purpose of taking testimony.    Hearings had been had before the referee, evidence had been taken and reported to

this court. Upon the filing of this report the matter was set for argument. It was upon the occasion of this argument that the brief or petition signed by sixty members of the Dane county bar was presented to the court with request for permission to file the same.

It will thus be seen that the matters pending before the court for adjudication were questions of fact presented by the evidence contained in the report of the referee. Questions of fact were to be determined and a legal conclusion upon such facts to be announced. The brief *amici curiæ* filed by the sixty members of the Dane county bar did not pretend to be of assistance to the court in either the matter of analyzing or weighing the evidence or in arriving at proper legal conclusions therefrom.

In the present application the document then presented is analyzed, and it is stated that "we requested permission to submit, in behalf of the respondent, the following: 1. That the practice of filing such a petition was permissible under certain decisions which were cited. 2. That in our dealings with *Mr. Stolen,* as a judge, we found him honest and honorable. 3. That we believed the indiscreet conduct of which he was guilty resulted from his financial situation. 4. That disbarment should only follow for gross misconduct. 5. That resignation by *Mr. Stolen* as judge, his financial condition, and the publicity given his acts constituted a severe punishment to him and warning to others. 6. That, because of the difficulty he would have in supporting himself and family and meeting his obligations if disbarred, he be not prevented from resuming his practice." It will thus be seen that the document presented was a sentimental appeal to the court in favor of *Mr. Stolen.*

It is a traditional conviction of civilized society everywhere that courts and juries, in the decision of issues of fact and law, should be immune from every extraneous influence; that facts should be decided upon evidence produced in court,

and that the determination of such facts should be uninfluenced by bias, prejudice, or sympathies.

In the early jurisprudence of England, juries were kept together from the beginning to the end of all trials, whether civil or criminal, for the purpose of protecting their decisions from all improper influences. This practice was departed from only when a trial lasting for thirteen hours made it impossible to keep them together any longer, Lord KENYON observing that necessity justified what it compelled, and that though it was left to modern times to bring forth cases of such extraordinary length, no rule could compel them to continue sitting longer than their natural powers would endure. *La Valley v. State,* 188 Wis. 68, 205 N. W. 412. This early practice as to juries came from the inherent belief of all members of society that litigants in court were entitled to have their cases determined upon the law as it existed and the facts as sworn to in court. That belief has obtained growing conviction to the present day. While it is now impracticable to keep juries together throughout the course of every trial, the practice prevails even now in capital offenses. Although necessities of the times compelled a relaxation of the rules early adopted for the preservation of the jury from extraneous influences, it is still expected that judges, with their great appreciation of the proprieties and responsibilities of their position, will neither permit nor tolerate the intrusion of considerations calculated to influence the conduct of men and the determination of matters pending before them for judicial decision. In obedience to this recognized rule of propriety, men of sensibilities and culture, especially members of the bar, are discreet in discussing the merits of pending litigation in the presence of judges before whom such litigation is pending. It is unnecessary to dwell longer upon this phase of the discussion. The assertions here made are universally accepted as proper standards of ethics.

But it is said that the constitution of this state, by sec. 4 of art. I, provides that "the right of the people . . . to petition the government, or any department thereof, shall never be abridged." It is said that the judiciary is a department of the government, and that the right to petition a court is therefore guaranteed by the constitution. We concede without further discussion that the judiciary constitutes a department of the government. The provision of the constitution, however, is that the right to petition shall never be "abridged." This language does not confer any new right, but secures existing rights. As said in *U. S. v. Cruikshank,* 92 U. S. 542, 551:

"The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government. It 'derives its source,' to use the language of Mr. Chief Justice MARSHALL in *Gibbons v. Ogden,* 9 Wheat. 211, 'from those laws whose authority is acknowledged by civilized men throughout the world.' It is found wherever civilization exists. It was not, therefore, a right granted to the people by the constitution. The government of the United States when established found it in existence, with the obligation on the part of the states to afford it protection."

The right of petition may be conceded to be an inherent right of the citizen under all free governments. This right has existed side by side with that standard of conduct set up and observed by the judgment of civilized peoples that courts shall decide causes only upon sworn testimony produced in court, to which shall be applied principles of law applicable to the situation. The right of petition, natural and inherent though it be, has never, so far as we can discover, been invoked to shatter the standards of propriety entertained for the conduct of courts. Throughout many centuries the right of petition has been recognized, but it

has never been considered that a court may be properly approached by a petition to make a specific disposition of a cause pending before it.   While our state constitution protects and preserves the right of petition, it is the right as it was known and exercised at the time of the adoption of the constitution.   That right shall never be abridged.   That right, however, never included the right to attempt to influence the decision of a court through the medium of a petition.   In fact, as the jurisdiction of courts expanded, the necessity for petitioning the government grew less.   In an article on this subject, to be found in Vol. XXI Encyclopædia Britannica (11th ed.), it is said:

"Petitions to the Crown appear to have been at first for the redress of private and local grievances, or for remedies which the courts of law could not grant.   As equity grew into a system, petitions of this kind not seeking legislative remedies tended to become superseded by bills in chancery."

Thus far our discussion has related to petitions as popularly understood.   There is a class of petitions which may properly be addressed to courts.   They are petitions which conform to the ordinary course of judicial procedure and serve to arouse the jurisdiction or action of the court upon justiciable matters.   This very proceeding was instituted by a petition signed by the officers of the Dane County Bar Association.   That petition aroused the jurisdiction, or action at least, of this court in the premises.   Petitions which have been established as a part of judicial procedure may be presented to courts, and such petitions are the only ones protected by the constitutional provision here invoked.

It is further said that the petition was not intended to influence the court upon a decision of the matter pending before it, but that it was rather an appeal for clemency, an appeal for mercy, an appeal to the pardoning power which the court, and only the court, might exercise in the premises. It was an appeal calculated to arouse the sympathies of the

court by placing before it matters which did not appear in the record made.   It was an appeal calculated to influence the judgment of the court upon the evidence contained in the record.   It was an appeal which placed before the court facts and circumstances not found in the record, which it was improper for the court to consider, the unconscious influence of which it would be impossible for men of sympathies to ignore.   It was an appeal for clemency, for mercy, and to the pardoning power, before any conviction was had, and was well calculated, if not intended, to have an influence upon the question of conviction.   The conclusion seems inescapable that a petition of such a nature presented at such a time constitutes an improper influence upon the decision of matters then under consideration of the court.   If the petitioners had in their possession facts material to the issues, they had an opportunity to appear before the referee and testify to those facts and submit themselves to cross-examination, thereby placing before the court in an orderly way everything material and proper before the court to consider.

Perhaps the correctness of our conclusion may be further emphasized by the suggestion that if it were permissible for the friends of *Judge Stolen* to thus importune the court, it were equally permissible for his enemies to do so.   *Judge Stolen* was deeply interested in the proceedings.   He had rights which should be protected.   He had a right to have his case determined upon the evidence produced.   His case should not have been prejudiced by representations in the way of petitions bringing matters to the attention of the court not placed before it in sworn testimony.   If he could not be thus prejudiced it would seem to follow as a necessary conclusion that he could not be thus assisted.

Before closing our discussion on this subject, it may be well to refer to the fact that the constitution guarantees liberty of speech as well as liberty of petition.   While there

seems to be no recorded case of an attempt to influence the court by petition, there are plenty of cases in which such attempts have been made through the columns of the press. This is generally held to be an abuse rather than an exercise of the right of free speech, and it is well settled that such efforts to influence the course of justice constitute contempt of court.    6 Ruling Case Law, 508 *et seq.*    The right of petition is no more sacred than the right of free speech, and as there may be an abuse of the right of free speech so may there be an abuse of the right of petition.    Any attempt to influence the courts of justice constitutes an abuse of either right.

Petitioners rely for approval of their conduct upon *In re Stephens,* 84 Cal. 77, 24 Pac. 46, and *In re Enright,* 69 Vt. 317, 37 Atl. 1046.    In each of these cases an attorney had been disbarred.    In each of the cases, after a judgment of disbarment had been entered, a petition was presented, signed by members of the bar, praying for a modification of the judgment of disbarment.    In each of the cases the petition was received by the court and acted upon.    In those cases, however, the court had acted upon the facts and pronounced its judgment.    Having the power to modify its judgment, which power perhaps may be compared to the pardoning power, members of the bar petitioned for a commutation of sentence, so to speak.    Those cases do not stand as a precedent for the petition here presented.    Those petitions were addressed to the discretionary power of the court. They were not calculated to influence the court in the weighing of evidence, in the determination of facts, and in the application of the law.    While we still must hold that the petition was untimely and improper, in view of the apparent belief of those presenting it that they were within their rights, we feel that the characterization of their conduct as "reprehensible" was unnecessarily harsh, and take this occasion to withdraw it, leaving it to the reader to supply his own characterization.

In conclusion, we may say that it is easy for those not charged with responsibility to act in accordance with their sympathies. Those charged with responsibilities are frequently at war with their sympathies. But if they could not suppress their sympathies they would be unfit to be charged with official duties. The members of this court who joined in the judgment of the court are not barren of the usual human sensibilities. They took no pleasure in pronouncing the judgment in this case. A different judgment would have been far more in consonance with their sympathies, but, unlike the petitioners of the Dane county bar, duty prevented the indulgence of their sympathies. We are content to submit the disposition of this case to the calm and impartial judgment of time.