STATE, Plaintiff, vs. BARTO, Defendant.

*September 20—October 14, 1930.*

*Spencer Haven* of Hudson, special counsel for the Board of State Bar Commissioners, for the plaintiff.

The cause was submitted for the defendant on the brief of *Henry Fitzgibbon* of Menasha.

ROSENBERRY, C. J.   In recent years in a number of cases this court has had occasion to consider the necessary moral qualifications of those seeking a license to practice law or to continue in the practice where license has already been granted.[1]   It is not necessary for us to restate the matters set forth and fully considered in these cases.   When a person enters upon the practice of the law he thereby assumes certain duties and obligations and is required to conform to certain standards in three principal relations: (1st) in his

---

[1] *Vernon County Bar Asso. v. McKibbin,* 153 Wis. 350, 141 N. W. 283; *Hepp v. Petrie,* 185 Wis. 350, 200 N. W. 857; *In re Law Examination of 1926,* 191 Wis. 359, 210 N. W. 710; *In re Pierce,* 189 Wis. 441, 207 N. W. 966; *In re Stolen,* 193 Wis. 602, 214 N. W. 379, 216 N. W. 127; *State ex rel. Board of Law Examiners v. Podell,* 189 Wis. 457, 207 N. W. 709; *In re Richter,* 187 Wis. 490, 204 N. W. 492; *State v. Cannon,* 196 Wis. 534, 221 N. W. 603; *State v. Kiefer,* 197 Wis. 524, 222 N. W. 795; *State v. Rubin,* 201 Wis. 30, 229 N. W. 36; *State v. Cannon,* 199 Wis. 401, 226 N. W. 385.

relation to his client; (2d) his relation to the courts and
fellow practitioners; and (3d) his relation to the public,
involving matters generally included within the broad term
*public policy*. This classification is not precisely accurate. It
is in the public interest that an attorney should in all respects
be loyal to the interest of his client, and each relation to a
certain extent overlaps and involves the others, but the
classification is accurate enough for purposes of general dis-
cussion. In most of the cases referred to, the matters com-
plained of related to breaches of duty and violation of pro-
fessional standards of conduct with relation to the public.
With one or two exceptions there has been no occasion to
consider matters relating to the duties and obligations of an
attorney to his client. Among laymen, and probably to a
considerable extent among lawyers, absolute fidelity and
loyalty to the cause of a client is set first among the duties
and obligations of a lawyer. A careful analysis will dis-
close that if conflict arises between a lawyer's duty to his
client and the court, his duty to the court must prevail. A
lawyer retained to act for a client becomes the client's *alter
ego;* he stands for and represents the interest of his client.
Disloyalty to a client is evidence of a dull and degraded
moral sense. If it cannot be said that it transcends in moral
obliquity a breach of his obligations and duties in other
relations, it subjects the lawyer to greater censure and more
condemnation because his duty is so much more easily and
readily discernible. These observations are made because
in the present case the acts of the defendant complained of
relate almost wholly to the attorney-client relationship.

The defendant urges that the findings of the referee are
not sustained. We have carefully examined the findings
thus challenged and it is considered that the findings are not
only well sustained by the proof but are, if anything, favor-
able to the defendant; that is, all doubts are resolved in his

favor. The findings and recommendations of the referee are printed in the margin.[1]

We have set out the findings in full because of the great difficulty of making a condensation of the same that fairly represents the referee's point of view. A consideration of these findings presents a course of conduct which · shocks one's moral sensibilities. It is quite evident from a consideration of these findings that the defendant was willing to

---

[1] *Count I—Magnus Nygaard.*

Count I charges in substance that the defendant was retained by Magnus Nygaard to procure for the latter a pardon for $500 compensation, contingent and conditional upon a pardon being granted, Nygaard to pay in addition actual expenses; that the defendant falsely and improperly informed Mrs. Nygaard that he had been successful, leading her to believe a full pardon had been granted; that a sum of money, together with an Oakland automobile, was turned over to the defendant to be sold for $1,100 with which to pay a claim owing by Magnus Nygaard to Harvey Durga; that he represented to Mrs. Nygaard that he had paid $500 or $600 on the Durga claim personally and induced her to borrow and pay the defendant the $500; that the defendant compromised the Durga claim for $550 and falsely represented to Mrs. Nygaard that he paid the full amount of the Durga claim; that he converted the automobile to his own use, never made any account, but falsely represented to the Nygaards that he had settled and paid the Durga claim of $1,100 in full.

*Count II—Harvey Durga.*

Count II charges that the defendant solicited a claim that Harvey Durga had against Magnus Nygaard; that he secured the handling of this claim under an agreement with Durga that the defendant should have fifty per cent. of the amount collected; that he paid Durga $550 and obtained a settlement in full of the claim, pretending to Durga that in the collection of the latter's claim he was acting for Durga; and that as to its payment he was pretending to act for the Nygaards in the pardon matter.

Counts I and II are so closely related that they may properly be considered together.

I find that Magnus Nygaard, who was an officer of a bank at Bruce, Wisconsin, was convicted of embezzlement and is serving a term in the state prison at Waupun. One of the charges on which he was convicted was the embezzlement of $1,100 from Harvey Durga. Early in 1928 Nygaard employed the defendant to undertake to secure a pardon and agreed to pay $500 for the latter's services, and in addition actual expenses. The compen-

take any advantage of his relations to his clients that would not subject him to criminal prosecution. In numerous instances he clearly and intentionally misrepresented the facts and in others attempts to justify himself by falling back upon an extortionate charge for legal services. He was guilty of extortion, and in a number of instances clearly overreached his clients. We shall not take the time to analyze and comment upon each one of these transactions.

sation that the defendant was to receive was not made contingent or conditional upon a pardon being granted.

The defendant was also retained by Harvey Durga to act for the latter in the collection of his claim of $1,100 against Magnus Nygaard. There is considerable confusion in the testimony as to whether the defendant was first retained by Mr. Nygaard or by Mr. Durga; some of the witnesses insisted that the defendant had the Durga claim for collection at least a month before he was retained by Mr. Nygaard. The defendant was retained by Mr. Nygaard in March, 1928. The exact date on which he was retained by Mr. Durga does not appear, but the evidence clearly shows that Mr. Durga had spoken to the defendant a number of times in reference to his claim before the defendant was retained by Mr. Nygaard.

In the pardon matter it was deemed essential by the defendant that restitution be made to Mr. Durga and also to the Atwood estate mentioned in the complaint, and he so advised Mr. and Mrs. Nygaard and stated to the governor that restitution would be made. The claim of the Atwood estate was paid by the Nygaards, but the latter were unable to obtain sufficient cash with which to settle the Durga claim. Mrs. Nygaard paid the defendant $500 for his services and $125 for expenses. The only way the Nygaards could make restitution of the Durga claim was to turn over an Oakland automobile which Mrs. Nygaard had purchased for $1,265.

The defendant made an agreement with Mr. Durga by which he was to have fifty per cent. of the Durga claim for collection. This agreement could not be found during the hearing of this case, but the evidence is quite clear that such an agreement was made. Mr. Durga signed also a release in full of his $1,100 claim, gave it to the defendant, took a receipt therefor, and instructed the defendant to deliver the release to Mrs. Nygaard upon receipt by the defendant of $550 for Mr. Durga. The agreement, release, and receipt were made at the same time. The defendant took the release to Mrs. Nygaard and she turned over to him the Oakland car in settlement of the Durga claim. The defendant took the car to Neenah, offered to turn it over to Mr. Durga in settlement of his claim, but the latter declined the car and insisted on the

A careful perusal and study of the findings reveals the moral quality of defendant's conduct.

Referring to Count IV, William J. Hess matter, it appears that the defendant as a broker sold 267 shares of stock for $1,200 on June 20, 1927, to the same party who had contracted to buy it a few months before for $2,300, and then reserved $600 for his compensation in making the sale. Not only that, he attempted to justify his conduct by alleg-

payment to him of $550. The defendant thereupon paid to Mr. Durga the fee of $500 he received from Mrs. Nygaard and additional sums amounting to $50. The defendant took the car to Mr. Nenning's garage where it was placed in the sales room for sale and left there sixteen days. An effort was made to sell the car, but without success. The fair market value of the car at that time was about $850. The defendant took the car and has since kept it. The defendant preferred to retain his fee of $500 and the additional $50 paid to Mr. Durga rather than to take the automobile. Assuming that he could have sold the car for $850, he profited to the extent of $300 by the transaction. However, he made a second application for a pardon for Mr. Nygaard and received nothing for his expenses or by way of compensation.

It appears without dispute that at the first meeting between the defendant and Mr. Nygaard he fully informed Mr. Nygaard of the fact that he was acting for Mr. Durga and had the Durga claim of $1,100 for collection on a fifty per cent. basis and that Mr. Nygaard informed him that that was satisfactory to him. Mr. Durga knew also that the defendant was acting for Mr. Nygaard in the pardon matter and was quite willing to settle the claim for $550. The release drawn by the defendant and signed by Mr. Durga recited the payment in full of $1,100 and was shown to Mrs. Nygaard.

Her husband was in jail and she was acting for him in the matter of settlement with Mr. Durga. The defendant did not inform her that he was settling the Durga claim for $550, and she in good faith believed when she parted with the car that she was making restitution of the Durga claim in full. Mr. and Mrs. Nygaard, after conferring with another attorney, believed for a time at least that they were not dealt with fairly by the defendant, but later and during the trial manifested a friendly feeling toward him. Mr. Durga had previously retained Messrs. Velte and Molzow in relation to his claim against Mr. Nygaard. Some time after he received the sum of $550 through the defendant, a demand was made on the defendant for the payment of $200 to Velte and Molzow for services they had performed for Mr. Durga. The latter had expressed no dissatisfaction with the defendant prior to that time but had indicated that he was well satisfied with the

ing that he had an agreement with his client to that effect, which intensifies rather than excuses the defendant's conduct. Such an agreement would be clearly extortionate, unfair, unreasonable, and one into which an attorney has no right to enter with his client. *Armstrong v. Morrow,* 166 Wis. 1, 163 N. W. 179. Contracts between attorney and client are subject to the closest scrutiny. If it appears that such contracts are unfair or the client has been overreached,

---

settlement. The defendant fully disclosed to Mr. Nygaard and Mr. Durga the facts relating to his retainer by each of them, but did not inform either Mr. or Mrs. Nygaard that he had settled the Durga claim for $550 and his interviews with and letters to Mrs. Nygaard misled her into the belief that full restitution was made of the Durga claim. He also informed her that the pardon would be granted and that it had been granted. The application for pardon was in fact denied, but it is undisputed that the governor before whom the application for pardon was pending told the defendant that he would grant the pardon, and when the defendant informed Mrs. Nygaard that the pardon had or would be granted, he relied on what the governor had said to him in that respect.

#### Count III—Henry Glander.

Count III charges that on about March 30, 1926, Carl Achtenhagen held the legal title to a farm in Dodge county, Wisconsin; that Henry Glander and his wife held a first mortgage thereon in the sum of $14,500; that at that time Anna Achtenhagen, mother of Carl, held a second mortgage on the farm; that on the date mentioned the defendant, as attorney for Carl Achtenhagen, went with the latter to the Glander residence at Mayville and without informing Glander of the existence of the second mortgage represented to the Glanders that a new note and mortgage for $14,500 then proposed to be given to them by Carl and wife to take the place of the former note and mortgage, would be a first lien on the farm, and induced the Glanders to accept a new note and mortgage then and there executed by Carl Achtenhagen alone without his wife joining therein, and induced the Glanders to execute a satisfaction of the first note and mortgage; that the release was fraudulently obtained, and that the defendant and Carl proceeded to the office of the register of deeds of Dodge county with the purpose and intent of placing the satisfaction on record in consummation of their fraudulent scheme; that the defendant represented to the Glanders that the new mortgage was executed in legal form, and conveyed all the interest of Carl Achtenhagen and his wife in the mortgaged premises and that it would take the place of and have the same value and security as the original mortgage held by the Glanders; that such representations were untrue; that the renewal

the contract is set aside on principles that govern the conduct of trustees generally. The facts found by the referee disclose on the part of the defendant an utter disregard of the duties and obligations of an attorney to his client.

In Count VI, Irving Larson matter, the amount involved was not large but the principles involved are as significant as if the amount had been ten times as great. Here Larson had sustained injuries for which he claimed the Chicago &

mortgage was not acknowledged before any officer and that the wife of Carl Achtenhagen had not and did not sign or execute the same.

I find that Carl Achtenhagen, son-in-law of Henry and Henrietta Glander, owned a farm in Dodge county, subject to the lien of three mortgages in the order of priority as follows: A mortgage of $12,500 held by Mr. and Mrs. Henry Glander; a mortgage of $4,500 held by Anna Achtenhagen, mother of Carl; and a mortgage of $3,000 held by a Mr. Guth.

At the request of Carl Achtenhagen the defendant went to Mayville about March 30, 1926, to see Mr. Glander. Carl informed Mr. and Mrs. Glander that a potato corporation wished to buy the farm and suggested that the Glanders satisfy their existing mortgage and take a new mortgage in the sum of $14,500. The defendant took part in that conversation. A new mortgage in that sum had, at Achtenhagen's request, been prepared by the defendant in which the necessary blank spaces were filled in typewritten form. The words in the mortgage, "except a mortgage of prior date to Anna Achtenhagen," are in the defendant's handwriting and were inserted at the Glander home. The defendant knew that Anna Achtenhagen held a second mortgage on the farm. He testified that it was not his intention that Anna Achtenhagen's mortgage should become the first mortgage, but believed that she would cancel her mortgage and take another and that such a mortgage would still be a second mortgage.

A satisfaction was prepared by the defendant which was intended to satisfy the mortgage of $12,500 held by the Glanders. The satisfaction was signed by Mr. and Mrs. Glander and the new mortgage was signed by Carl Achtenhagen and not by his wife. The defendant took the acknowledgment of both instruments in Dodge county as justice of the peace of Winnebago county, believing he had authority to do so.

The new note and new mortgage were left with Mr. Glander, and the defendant and Carl Achtenhagen immediately went to the register of deeds at Juneau and attempted to have the satisfaction recorded. The satisfaction had only one witness, the new mortgage had not been signed by Mrs. Achtenhagen, and the register of deeds advised against the recording of the satisfaction until Mrs. Achtenhagen signed the new mortgage. The defendant and

Northwestern Railway Company was liable. Without making much of any investigation, defendant entered into an agreement with him that defendant was to have all he could collect over $50. Defendant then made a settlement with the railroad company for $300 and received in addition $25 to pay for his services in having a guardian appointed. He filed a petition, verified it himself, on January 23, 1926, to the effect that personal property of the minor did not ex-

Achtenhagen returned to Mayville on the same day and procured the signature of an additional witness on the satisfaction.

In the meantime Mr. Glander took the new note and new mortgage to his son-in-law, Otto Lueder, and the latter called his attention to the language in the mortgage "except a mortgage of prior date to Anna Achtenhagen," and told him that the mortgage was no good. When the defendant and Carl returned to Mayville and saw Mr. Glander the latter said to them: "It seems to me you are doing crooked work here." On the following day Mr. Glander laid the matter before John H. Thiel, district attorney, and the latter signed a complaint and issued a warrant for the defendant and Carl Achtenhagen. The latter was arrested, but later Mr. and Mrs. Glander indicated an unwillingness to prosecute their son-in-law. The defendant went to the district attorney's office and explained his version of the transaction, declaring that he was a young lawyer and didn't know much about conveyancing and had been tricked or pulled into it by Achtenhagen. The district attorney knew that Achtenhagen was reckless with the truth and accepted the defendant's explanation and did not press the criminal case against him. After investigating the facts the district attorney concluded that the defendant acted foolishly and really didn't know what the whole transaction meant and proceeded to give him a lecture. At the time this transaction occurred the defendant had been practicing law only about four months. This was the first mortgage he had drawn and he, obviously, did not appreciate the danger to Mr. and Mrs. Glander from the transaction. Unfortunately, the defendant testified that the conversation between Carl Achtenhagen and Mr. and Mrs. Glander was in German and that the Glanders understood and spoke English very imperfectly. This is denied by Mr. and Mrs. Glander, both of whom were witnesses in this action and appeared to speak and understand the English language quite well.

At the time the new mortgage was signed Mrs. Carl Achtenhagen was ill at Neenah. After Achtenhagen was arrested he surrendered the satisfaction of mortgage to the district attorney. While the satisfaction was intended to satisfy the $12,500 mortgage held by Mr. and Mrs. Glander, it in fact described a different mortgage, and this fact was not known to the defendant until Mr. Haven drew his attention to it during the trial of this case.

ceed in value $50. He knew at that time that the railroad company would settle on the basis of $300. After the money was paid he made out a petition and guardian's report correctly stating the facts. This report, however, was never filed. He procured Larson to indorse the $325 check without disclosing to him what it was, took the money, drew a second report as guardian which he verified, dated January 29, 1926, being six days later, in which he represented

### Count IV—William J. Hess.

Count IV charges that on about June 20, 1927, William J. Hess owned two hundred sixty-seven shares of the capital stock of the Menasha Boiler Works, and prior to that time made a tentative sale of the stock to John Strange Paper Company for $2,300; that sale was not consummated and he retained the defendant to make an effort to sell the stock to the Paper Company; that the defendant made a sale of the stock to the Paper Company for $1,200; $600 was paid about June 20, 1927, and the balance became payable in sixty days from that time; that the first $600 payment was turned over by the defendant to Mr. and Mrs. Hess; that the defendant received the deferred payment of $600, kept it, made no accounting of it, and claimed it as his attorney fees; that in making the sale the defendant interviewed the Paper Company not to exceed three times, occupying altogether not to exceed three hours; that he drew a contract of sale and that the value of his services and a fair charge therefor would not exceed $100; that at that time Mr. Hess was in very poor financial circumstances, badly in need of funds, and the stock in question constituted his main and almost sole assets, although he had formerly been a successful business man of considerable means, all of which was known to the defendant.

I find that William J. Hess owned two hundred sixty-seven shares of the capital stock of the Menasha Boiler Works. Each share was of the par value of $100. On about February 15, 1927, he made a tentative sale of the stock to the John Strange Paper Company for $2,300. Nash and Nash, attorneys of Manitowoc, drew a contract of sale, Exhibit 51, but it was never signed. The certificates of stock had been lost and Mr. Hess undertook to secure a better price for the stock. Mr. Hess did not sign the contract and Mr. Strange withdrew the offer about February 25, 1927. Thereafter, negotiations were reopened and Mr. Strange was willing to extend the time for the consummation of that contract to March 15, 1927; but that time expired and the contract was not consummated.

The day before Decoration Day, 1927, Mr. Hess employed the defendant to make a sale of the stock, and on June 20, 1927, through the efforts of the defendant, the stock was sold to the

that he had received for the ward's use $50. Manifestly the report of January 23d or the report of January 29th was false. The situation did not come to the attention of the county judge until on or about July 26, 1926. The referee says:

"I find that the report, Exhibit 32, filed and verified by the defendant, showing that the total assets that came into his hands as guardian of Irving Larson were $50, was

John Strange Paper Company for $1,200. A contract of sale was executed and bears date June 20, 1927, Exhibit 28. Under the terms of that contract, $600 of the purchase price was paid at the time the contract was executed, and $600 was to be paid within sixty days from its date. The provision in the contract setting forth the times of payment is as follows:

"And Strange agrees to purchase said certificates of stock and to pay therefor the sum of $1,200 as follows: $600 at the signing of this said agreement by the said Hess, and the remaining $600 to be paid to Attorney Glen W. Barto of Neenah, Wisconsin, within sixty days from the present date."

The down payment of $600 was made to the defendant and he paid that sum to Mrs. Hess. When the second payment of $600 became due it was paid by the John Strange Paper Company to the defendant and has been retained by him, the latter claiming the $600 belonged to him by virtue of a contract of sale, Exhibit 28.

It is claimed by the defendant that when he was retained by Mr. Hess he and Hess entered into an agreement by which the defendant was to receive $600 for his services. That agreement was not produced and its execution is denied by Mr. Hess. Mr. Hess claims that when the contract of sale was made he inquired as to why the deferred payment was made payable to the defendant and the latter replied that it was to protect or secure him for compensation for his services. When the contract was about to be executed by Hugh Strange on behalf of the Strange Paper Company, the defendant told Mr. Strange that he had loaned some money to Mr. Hess and that such a provision would secure him for the money loaned. When the defendant turned over the first payment of $600 to Mrs. Hess, she offered to give him some money on his fee and he replied not to worry about it; that he would get his out of the balance and he wanted to help Mr. Hess. When the defendant received the final payment of $600 Mr. and Mrs. Hess went to his office and Mr. Hess asked for a settlement and was told by the defendant that there was nothing coming to him. Mrs. Hess said to the defendant: "Oh, Mr. Barto, you surely can't expect to take $600," but the latter replied that the rest was his and that that was his understanding.

knowingly false and that his conduct as guardian and attorney, as appears by the foregoing findings, was intended to mislead and did in fact mislead his ward, the ward's father, and the county judge."

Here we have a situation in which the defendant, for the purpose of procuring an unreasonable amount of money from his client, not only misrepresents matters to his client

· The defendant denied the conversation with Hugh Strange and the conferences with Mr. and Mrs. Hess, but the evidence bearing· on those conversations strongly preponderates against him.

The defendant claimed that in order to make the sale of the stock he was obliged to make efforts to secure an extension of a mortgage and to investigate some Northern lands. This, however, is denied by Hugh Strange, William J. Hess, and E. W. Thomas of the Greenlaw-Thomas Abstract Company, and who, as trustee, held a mortgage of some $8,000 against the Menasha Boiler Works. In addition to drawing the contract for the sale of the stock, the defendant drew also an affidavit in relation to the lost stock. Mr. Hess had only a few short interviews with the defendant and the latter had only three interviews with Hugh Strange, consuming three or four hours. The contract for the sale of stock, Exhibit 28, is short and is similar in its language to Exhibit 51, the contract drawn by Mr. Nash.

Mr. Hess employed D. K. Allen, an attorney at Oshkosh, and brought an action against the defendant in September, 1929, to recover the sum of $600 less a reasonable compensation to the defendant for his services. That action had not been tried at the time this disbarment case was argued, February 6 and 7, 1930. After Mr. Hess commenced an action against the defendant, the latter went to a reputable attorney and was advised to defend and contest the action.

If Mr. Hess has a cause of action against the defendant, his rights can, of course, be fully protected in his action against him. On the evidence presented to me I am forced to the conclusion, and therefore find, that the charge made by the defendant for the services actually and necessarily performed for Mr. Hess in relation to the sale of the stock is wholly disproportionate to the services rendered. The charge is unjustifiable and excessive. Mr. Hess, Mr. Strange, and Mr. Thomas appeared to be fair and honest witnesses, and their testimony shows conclusively that no great amount of services were necessary or performed in connection with the sale of the stock; and on the testimony presented in this case, I find that the reasonable value of the defendant's services does not exceed $100; and as I view the testimony, the charge should have been less than $100. Mr. Hess had some time previously been a man in comfortable circumstances, but he lost practically everything he had, and the $1,200 for which he sold

but files a verified document with the court which he knows to be false and upon which the court was misled. This transaction is a clear and unmistakable violation of the professional duty of defendant in each of the three relationships. The nature of the transaction leads irresistibly to the conclusion that this was not mere error or mistake, but was the result of a design and a well settled purpose to

his stock in the Menasha Boiler Works was about all he had left. At the time he entered into the contract for the sale of this stock he was in necessitous circumstances, and it is regrettable that any advantage should have been taken of him.

*Count V—Henry Schwandt* (omitted).

*Count VI—Irving Larson.*

Count VI charges that on December 9, 1925, Irving Larson, a minor, sustained damages in the automobile collision with the Northwestern Railroad Company; that his case was solicited by the defendant; that he paid the defendant $25 as a retainer; that he induced Larson to sign a paper without the latter knowing the contents that the defendant should have all he collected over and above $50; that he settled the claim for $325 and accounted to Larson for only $50; that the defendant was appointed guardian for Larson; that the county court authorized an adjustment of the claim for $325; that he induced Larson to sign a receipt for $50 without the latter being informed of its contents; that under date of January 29, 1926, the defendant as such guardian verified a report in the guardianship matter in which he swore that he received only $50 and paid that amount to the minor; that there remained in the hands of the guardian belonging to his ward the sum of $275; that on the report so filed showing only $50 in his hands as guardian, the county court made an order discharging the defendant as guardian; that thereupon the county judge wrote the defendant a letter that the latter was authorized to settle for $325 and had accounted for only $50; that the defendant replied that he had entered into a writing with Larson that he was to return to the latter the retainer fee of $25 and give him $50 cash out of the settlement and admitted the receipt of $325; that the defendant was informed by the court that the explanation was not satisfactory and was requested to file his bill in the regular way; that no other adjustment or disposition was made of the guardianship matter.

I find that the claim of Irving Larson was not solicited by the defendant. On December 9, 1925, Larson sustained injuries in an automobile collision with the Northwestern Railroad. He was a minor and did not reach the age of twenty-one until June 10, 1926. Larson retained the defendant as his attorney and paid him a retainer fee of $25. On January 8, 1926, the defendant

overreach his client and impose upon the court. The moral qualities of acts of this sort are not to be determined by the amounts involved.

The Holm transaction, Count IX, is clearly indicative of the defendant's tendency to impose upon and overreach his clients and discloses the fact that he has no notion of his duties and obligations as an attorney and counselor at law. Defendant's attempt to balance the account by an over-

entered into a retainer agreement, Exhibit 29, with Irving Larson and Henry Schwandt. This agreement contains the following provision:

"That if Mr. Barto can secure the sum of $50 for each of same will be satisfactory and Mr. Barto can have any sum over this that he can get for his services."

It was agreed between the defendant and the railroad company that the latter should pay $300 in settlement of the claim and in addition $25 to the defendant for his services in having a guardian appointed. The defendant had theretofore received $25 from Mr. Larson, so that there actually came into his hands $350.

At the time the agreement, Exhibit 29, was made, the defendant knew that Larson was a minor. The defendant was appointed guardian of the minor. He verified the petition for the appointment of a guardian on January 19, 1926, Exhibit 41. In this petition it is stated:

"That the personal property of said minor does not exceed the value of $50, . . . as petitioner is informed and believes." When this petition was made, the defendant knew that the settlement with the railroad company was on the basis of $300 plus $25 for the appointment of a guardian.

On January 19, the defendant, as guardian, petitioned the county court for authority to compromise the claim. The petition recites:

"That said company by way of adjustment and compromise of said claim has offered to pay to the said minor the sum of $325," Exhibit 30.

On the same day an order was made by the county court authorizing and approving a settlement for $325, Exhibit 31.

Under date of January 23, 1926, the defendant made and verified a report as guardian, and claims he mailed this report to the county court. No such report could be found in the county court files and the county judge testified he never received it. That report, Exhibit 57, was verified January 23, 1926, and recites under the head of

*"Items received"*—Jan. 22d:

"Received from Chicago N. W. Ry. Co. the principal sum of $325, which sum this ward had paid out for doctor bills, care, and

charge for services adds to rather than subtracts from the unethical and immoral character of the transaction.

The referee was apparently inclined to excuse the defendant on the grounds of his youth and inexperience. Some of the transactions set out in the findings indicate a want of competence that would have prevented the admission of the defendant to the bar had they been disclosed at the time he applied. No court or body charged with the duty to as-

for legal counsel, costs and disbursements for an accident caused by said railroad at Neenah on December 9, 1926 (this date should have been 1925 instead of 1926) .........................$325."

The report under the head of "Disbursements" states:

"Jan. 23, 1926—To said ward, sum of $325................$325."

On the same day, January 23, 1926, the defendant as general guardian issued a check for $325 payable to the order of Irving Larson. This check is dated January 23, 1926, and is indorsed by Irving Larson. The latter claims that he did not see the face of the check and did not know what he was indorsing. The check was cashed January 25, 1926, by the defendant, and the sum for which the check was drawn was not paid to Larson.

The defendant took from Larson a receipt for $50 as the agreed sum of the latter's damages in the case against the railroad company. That receipt, Exhibit 33, is likewise dated January 23, 1926. The defendant procured from Larson, while he was still a minor, a release, Exhibit 34, which in form acknowledges that the latter received of the defendant, as general guardian, all moneys and property held in trust for him which came to the defendant by virtue of the case against the railroad company; and in form released and discharged the defendant as guardian. This release purports to be acknowledged January 23, 1926, the same date as appears on the receipt, Exhibit 33; the check, Exhibit 61; and the report, Exhibit 57.

The defendant, as guardian, filed a report, Exhibit 32, in the county court, the material part of which follows:

Received for Ward's use. January 22, 1926, from Chicago & N. W. Ry. Co........................................ $50
Disbursements. January 23, 1926, to Ward, the entire sum of $50 as the inclosed receipt shows.
Money used for necessary clothing........................ $50

This report is verified by the defendant under date of January 29, 1926.

The defendant procured an order, Exhibit 35, discharging him as guardian. The order is dated June 8, 1926. Under date of July 13, 1926, the county judge wrote the defendant a letter, Ex-

certain the qualifications of an applicant for the bar would have admitted the defendant with a record such as is presented in this case before it. It is evident also that the referee thought of the judgment which should be entered as in the nature of a punishment. Of necessity a judgment which deprives an attorney of his right to practice, or to pay a certain sum in lieu of such deprivation, is to some extent a punishment, but that is not and should not be a

hibit 36, calling his attention to the fact that a settlement on the basis of $325 was authorized and that the latter accounted for only $50, and asked him to come to the court and explain, otherwise the order of discharge would be set aside. Under date of July 14, 1926, the defendant wrote the county judge and advised him that there was an agreement between the defendant and Larson and Schwandt; that the boys had each advanced $25 and that the defendant was to have fifty per cent. of all he collected. He also advised the county judge that he settled the Larson claim for $300 and that he paid him $50 and had a receipt for it.

Under date of July 26, 1926, the county judge again wrote the defendant, Exhibit 38, advising him that his explanation was not satisfactory. In that letter the judge said:

"I cannot conceive of an attorney, acting as a guardian for a minor, getting $275 out of a $325 lawsuit. . . . I cannot feel that you have any right to make a contract with a minor and bind him to $50 when you get $275. You can file your bill and I will pass on it in the regular way."

Under date of July 26, 1926, the defendant replied by letter, Exhibit 39, inclosing an affidavit from young Larson's father, and advising the county judge that it was impossible for the defendant to say just what his fee would be at that time as there were some disputes to settle. The affidavit, Exhibit 40, is dated July 28, 1926. In the affidavit it is stated that the son had received $50 and that that was agreeable.

There is further in evidence a paper bearing date January 21, 1926, Exhibit 62, purporting to be signed by Irving Larson. This paper in substance recites that if settlement is reached with the railroad company that Larson is to receive all costs advanced and $50 for his damages, and that all doctor bills and hospital bills and expenses are to be assumed by the defendant. At the foot of the paper and after Larson's signature, the following appears:

"I have received payment in full of $50 and $25, the costs advanced, this 21st day of January, in 1926.

"Irving Larson, Plaintiff.

"$25 PP. paid in May, 1929."

primary consideration of those having to deal with cases
of this character. As has been pointed out in the cases al-
ready referred to, the principal question is, Should a person
so lacking in moral sense and appreciation of the relation of
attorney and client as is the defendant in this case be per-
mitted in the public interest to continue the practice of law?
*Ex parte Wall,* 107 U. S. 265, 2 Sup. Ct. 569. A license
to practice law or any profession ought by its very nature

---

The defendant claims that out of the $350 received by him he
paid the following sums:

$56.00—To Velte & Molzow for Dr. Smith.
10.00—To Dr. Ryan.
7.50—Hospital bill.
1.00—To Irving Larson's father.
50.00—To Irving Larson.
25.00—To Irving Larson.
25.00—To J. L. Johns.
25.00—To Irving Larson.
7.50—Hospital bill (paid again).
15.00—Expenses.

---

$220.00—Total, leaving $128 retained by the defendant for
his services.

I find that the items so claimed to have been paid by the defend-
ant were in fact paid by him, except the second item of $25 to
Irving Larson and the item of $7.50, hospital bill that he claims
he paid a second time. This leaves $160.50 retained by the defend-
ant for his services. Irving Larson regarded the transaction with
the defendant closed until he talked with another attorney. He
first learned in the spring of 1929 that a settlement was made
for $325. He knew what had been received in settlement before
he signed the receipt in May, 1929. The defendant deposited the
$325 with his individual funds in the bank. Irving Larson left
Neenah in May, 1926, and went to North Dakota. His father,
Anton Larson, first learned in the summer of 1929 that a settle-
ment was made for $325. He first learned during the trial of
this disbarment action that the defendant had been appointed guard-
ian for his son.

It appears that the defendant has had a number of matters in the
county court of Winnebago county since he made his report as
guardian for Irving Larson and that his conduct before the court
since that time was satisfactory to the county judge. I find that
the report, Exhibit 32, filed and verified by the defendant showing

to be an assurance of the moral fitness and professional competency of the licensee upon which those seeking his services may rely. There is therefore ,a larger question involved than the interest of the defendant, important as that is.

We look with considerable leniency upon transgressions committed by young and inexperienced persons. Youth is inclined to act from impulse rather than settled reasoned

that the total assets that came into his hands as guardian of Irving Larson were $50, was knowingly false, and that his conduct as guardian and attorney, as appears by the foregoing findings, was intended to mislead and did in fact mislead·his ward, the ward's father, and the county judge.

Count VII—Emlyn Owen (omitted).
Count VII—Nick Nenning (omitted).
Count VII—Lydia Stilp vs. A. E. Elmquist (omitted).
Count VII—Ross vs. McGinn and State vs. McGinn (omitted).
Count VIII—Laverne Pelton (omitted).
Count VIII—Ida Solomon (omitted).
Count VIII—Mrs. Julia Hess (omitted).
Count VIII—Edward Malouf (omitted).
Count VIII—Frank Dumbeck (omitted).

*Count IX—Clarence C. Holm.*

This count charges in the fall of 1925 the defendant, knowing Hill, Thomann and Beckwith were employed by Clarence C. Holm in a divorce action, solicited and secured the case. He advised and persuaded Holm to transfer his property to the defendant for the purpose of covering up and preventing Holm's wife from securing any part of the property; that Holm transferred to the defendant all his property consisting of an auto-greasing equipment, cash register, Buick roadster, and an interest in an apartment or flat building in Racine; soon thereafter the defendant disposed of the property and paid certain amounts of the proceeds and retained in his hands $937.50, for which he has never accounted; that his services were reasonably worth not to exceed $300, leaving a net sum in his hands of $637.50 unaccounted for.

I find that the defendant did not solicit this case nor improperly displace the attorneys originally retained by Clarence C. Holm. It appears that Holm wished Mr. Hill to take personal charge of the case, and when he found that it had been turned over to a young man in the office he became dissatisfied and employed the defendant.

While acting as attorney for Holm, the latter transferred to the defendant certain personal and real property. The defendant sold the property, receiving therefor $1,477.50, including an item of $300 rent, out of which the defendant paid to Tenney, Reynolds and Davis, attorneys for Mrs. Holm, $315, in order to obtain from

convictions. Young people are often thoughtless. Life has not acquainted them with the standards of conduct which obtain in the various relations of life and they may by reason of that fact be the victims of mistake. Here, however, is presented a course of conduct extending over a number of years. The tendencies exhibited in the earlier years grow stronger and the transactions present a picture of one who has grown bolder and more deft in the execution of his

her a release of her inchoate right of dower in the real estate, leaving $1,162.50. The property transferred by Holm to the defendant and the sums realized therefor are as follows:

| | |
|---|---|
| Rent from Racine property | $300 00 |
| Proceeds from sale of Racine property after deducting $315 | 685 00 |
| Received from cash register | 87 50 |
| From greasing outfit and car | 90 00 |
| Total | $1,162 50 |

During the trial of this disbarment action the defendant claimed the following credits:

| | |
|---|---|
| Paid Mr. Hall for rent | $125 00 |
| Paid to Mr. Holm | 100 00 |
| Defendant's legal services | 530 50 |
| Services in relation to a lease | 25 00 |
| Expenses to Madison | 70 00 |
| Carfare to Chicago | 10 00 |
| Expenses | 20 00 |
| Expenses to Racine | 15 00 |
| Expenses to Madison | 5 00 |
| Expenses to Racine and Milwaukee | 15 00 |
| Additional expenses | 15 00 |
| Cash to Holm's mother | 50 00 |
| Mother's board bill | 40 00 |
| Total | $1,020 50 |

Assuming that the defendant made the expenditures and disbursements above mentioned, and assuming that his charges for services are of the reasonable value of $530.50, there still remains in his hands $142 unaccounted for.

During the trial of this action the defendant submitted a bill for his services. This itemized bill, Exhibit 77, was prepared recently. In this bill his charges for services are at the rate of $5 per hour and there is testimony that that is a reasonable charge per hour. It will be noted that the hours for which the defendant charged run from six to thirteen hours per day. These charges were

plans. The defendant is thirty-two years of age, the age at which Alexander was conqueror of the world, Napoleon was first consul of France, and, coming closer home, the defendant is older than was Mr. Justice PAINE when he became a member of this court. Defendant had had a considerable experience of life. He studied pharmacy, was a graduate of a high school, had studied law at the University of Wisconsin, and had been engaged in the practice

made just after the defendant had been admitted to the bar. Otherwise stated, his charges run from $30 to $65 per day.

Under date of November 10, 1925, the defendant and Clarence C. Holm entered into an agreement in writing, Exhibit 45, by which, in consideration of services already rendered and money advanced and for services to be performed by the defendant, Holm transferred all of his right, title, and interest to any moneys coming to the defendant from the sale of certain property transferred by Holm to the defendant. In this agreement Holm is referred to as the first party and the defendant as the second party. It contains the following paragraph:

"It is further agreed that the party of the first part hereby empowers the party of the second part through this assignment, to use any means, legal or equitable, to secure any money coming to him to take care of the divorce judgment, and said party of the second part is empowered to act at all times as if the party of the first part was himself acting."

Under date of April 2, 1926, the defendant wrote Holm a letter, Exhibit 46, in reply to a letter received from Holm asking for an itemized account of money loaned and advanced by the defendant to Holm and for legal services. In response to this request the defendant wrote the letter, Exhibit 46, in which it is stated:

"Clarence, I have a contract in my possession signed by you in the presence of two witnesses and a notary public, giving me all of your right, title, and interest in your Racine property. It was mine to do as I pleased with so long as I sold it and you signed the papers. . . . I have this contract here on file, which gives me the entire ownership of your property."

George Lange, an attorney at Madison, acting for Mr. Holm, also wrote the defendant for an itemized statement of his account, and under date of April 5, 1926, the defendant replied, Exhibit 47, in which he said:

"Now, George, to begin with, I would like to have you come up here if you are not too busy and I will show you everything I can to convince you that I have not at this time nor ever had any money in my hands belonging to Clarence C. Holm."

The defendant received another letter from Mr. Lange and replied under date of April 9, 1926, Exhibit 48, in which he stated:

"You speak of my having money in my hands of his which I

of law nearly four years. It is quite apparent that the acquisitive instinct of the defendant is overmastering. Everything seems to be subordinated to that. The methods and means employed are not matters of serious consideration unless they are of the character to entail serious consequences to the defendant himself. The effect of the transaction upon his client seems to be no concern of his. He treats his clients with less consideration than an ordinary

paid to Harry Hall. Let me tell you that the money I paid to Harry Hall was my own money, advanced by me, owned by me, and that I speak the truth when I say that I have not now or never had any money in my possession belonging to Mr. Holm."

The defendant claims that after he sold the Racine property he met Holm in the Wisconsin Hotel in Milwaukee and went over the items of account with him verbally. When the defendant wrote the letters, Exhibits 47 and 48, to Mr. Lange, he was claiming the money received from the Racine property under the agreement he had with Holm, Exhibit 45, and claimed also that he had another paper by which Holm gave him the Racine property to do with as he saw fit. The agreement, Exhibit 45, however, was intended to take the place of the other paper referred to.

I find that irrespective of whether the contract, Exhibit 45, may be construed as an absolute conveyance in form, or whether it is in legal effect a power of attorney, it was clearly not the intention of Clarence C. Holm to make the defendant the actual owner of the property therein described, nor of the proceeds from a sale thereof. The relation between the defendant and Holm was that of attorney and client, and it was the duty of the defendant to make an honest accounting of the proceeds derived from the sale of the property to his client. Although it appears without dispute that $5 per hour is a reasonable compensation for services rendered by an attorney, I cannot escape the conclusion that the charges made by the defendant for services to Mr. Holm are quite high. The defendant was almost wholly without experience as a lawyer. The itemized statement was made during the trial of this action. It is common knowledge among lawyers of experience that they do not ordinarily receive $62.50 per day for their services. It is more than counsel for the State Bar Commissioners receives while engaged in actual trial work; it is more than the Justices of the Supreme Court receive per day, on the basis of three hundred working days in a year.

### Recommendations.

The defendant is thirty-two years old. After graduating from a high school he took up the study of pharmacy for two years. He studied law as an adult special at the University of Wisconsin. He read law in a law office and took some work by corre-

person would treat a party with whom he was dealing at arm's length. When the moral quality of his acts are drawn in question he exhibits no sense of shame or humiliation, nor did he manifest an inclination to repent and make restitution, but proceeded to bolster up derelictions by resort to acts which are themselves evidence of a lack of moral fitness.

The facts disclosed by this record compel us to reach the conclusion that the defendant should not, either in his own interest or the public interest, continue in the practice of

spondence. He passed the Bar examination and opened a law office December 7, 1925, at Neenah, Wisconsin. He was married in 1926. His annual earnings were about $3,500 from his profession until August 3, 1929, when this disbarment action was commenced. He has earned practically nothing since that time. He owns a home valued at $5,000 and owes $2,000 debts.

While he was at law school he received no instruction in professional ethics. About two years ago he read the canons of ethics adopted by the American Bar Association, but did not study them. He is a member of the Winnebago County Bar Association and attended one of its meetings; he also attended the 1929 conference of the Wisconsin Bar Association.

On opening an office at Neenah he at once plunged into the practice of law with little or no experience. In some instances he consulted another lawyer, but on the whole received very little advice or guidance. He undertook to do legal work that he did not understand and with which he was surprisingly unfamiliar. His efforts in preparing the Glander mortgage and satisfaction, his attempt to enter into a contract for compensation with Irving Larson, a minor, his apparent assurance that a transfer of property to him by Clarence Holm, while the relation of attorney and client existed, and under the circumstances of that transaction, gave him the actual title of the property and the proceeds of sale, without any duty or obligation to account to his client, and other conduct shown by the evidence in this case,—amply demonstrate his lack of experience and understanding. Unfortunately for the defendant, he allowed himself to become involved in controversies with several clients over the matter of charges for legal services. Perhaps through no fault of his own, a bitter feeling arose between him and a justice of the peace and a brother attorney at Neenah.

The referee has experienced considerable difficulty in an effort to determine what to recommend in this case. The defendant is young and his conduct, obviously, should not be judged by the same test that may properly be applied to an older and experienced practitioner. He has already had considerable punishment. The disbarment action commenced against him was given wide publicity.

the law.   We reach this conclusion with reluctance after having given full consideration not only to the recommendations of the referee but to the matters urged in favor of the defendant in the very extensive brief filed in this case.

*By the Court.*—It is ordered and adjudged that the name of the defendant, Glen W. Barto, be and the same is hereby stricken from the roll of attorneys of this court, and the license to practice law heretofore granted to him be and the same is hereby revoked and he is ordered and required to desist from the practice of law in this state.

---

Several of the charges made against him are unsupported by the evidence.   The statement of alleged misconduct as presented to the Bar Commissioners of Wisconsin fully warranted the commissioners in bringing this action and charging him with the various acts of misconduct set out in the complaint.   The evidence presented at the trial in several respects differed very materially from the statements presented to the commissioners.   The defendant has been subjected to considerable punishment for his misconduct.   His earnings from his profession ended August 3, 1929, when this action was commenced and the charges contained in the complaint were given publicity.   He has been subjected to a long expensive trial in which the transcript of testimony exceeds thirteen hundred pages.

The trial of this action was conducted by counsel for the State Bar Commissioners and by counsel for the defense with the utmost fairness and with commendable dignity and courtesy.   It is believed ·that this trial has been of real educational value to the defendant, and perhaps to others.   Efforts were made throughout the trial to impress the defendant with the fact that there is a marked difference between this profession on the one hand, and commercial pursuits on the other.   While it is true that several of the charges in the complaint are unsupported by the evidence, and some acts of misconduct are explainable on the theory that he was lacking in experience,—his charge of $600 to Mr. Hess on a sale of stock for $1,200, his failure to make a true and correct report as guardian of Irving Larson, his claim of ownership to the proceeds from the sale of property transferred to him by Mr. Holm while the relation of attorney and client existed, and his failure and refusal to make any accounting of these proceeds constitute, in the opinion of the referee, such misconduct as should not be overlooked.

A review of the entire case impels the referee to—

Recommend a fine not exceeding two hundred fifty dollars ($250), together with such suggestions or warning to the defendant as to his future conduct as may be deemed advisable by the court.