STATE, Plaintiff, vs. O'LEARY, Defendant.
STATE, Plaintiff, vs. SULLIVAN, Defendant.

*June 6—June 29, 1933.*

*Spencer Haven* of Hudson, attorney for the plaintiff and counsel for the Board of State Bar Commissioners.

*Philip A. McHugh* of Detroit, Michigan, for defendant Sullivan.

*John L. Newman* of Milwaukee, for defendant O'Leary.

PER CURIAM. The information contains two charges against the defendants: (1) that they were sentenced to a term in the house of correction on conviction by a jury in the United States district court for the Eastern district of Wisconsin of the crime of conspiracy to bribe, and (2) that in procuring for the preparation of a bill of exceptions for use on appeal from the judgment of conviction a transcript of the evidence taken upon the trial of the case wherein they were so convicted and sentenced, they tried to induce the court reporter who took the testimony upon the trial to insert evidence given by the defendant O'Leary upon a former trial in lieu of his testimony given upon the trial whereon he was convicted, and to note exceptions to adverse rulings not taken upon the trial, which the reporter refused to do; that after the reporter had furnished a transcript of the evidence upon their said trial they changed the reporter's transcript by inserting therein portions of the testimony given by

O'Leary upon said former trial, and by inserting exceptions to rulings not taken upon said trial which the reporter had refused to insert, and served this changed transcript upon the district attorney as the transcript of the reporter; and that in the process of settling the bill of exceptions for use upon their appeals they served on the United States district attorney a prepared bill of exceptions in which they inserted three exceptions to rulings of the court which were not taken by them upon said trials.

After argument of the case to this court, the court remanded the cases (207 Wis. 297, 241 N. W. 621) to the referee to permit the receipt of evidence to show that "the facts which formed the basis of their conviction are not true," without passing upon or in any way mentioning the second count of the information, which charged them with attempt to falsify the record in the appellate court.

The case is now before us for disposition upon the second count and the whole record respecting the facts which formed the basis of the conviction charged in the first count.

Respecting the matters involved in the second count, the referee found specifically that all the allegations therein made are true and that the defendants' acts therein involved were done at the suggestion of an experienced attorney of the Chicago bar. He further finds that the defendants were not familiar with the federal practice; that they were without means to procure competent counsel; that they realized that their imprisonment was imminent, and were under great mental strain; and that they disclaimed any ulterior or fraudulent motive in their said acts.

Upon the re-reference a vast amount of evidence was received. The referee found that the facts which formed the basis of the conviction in the conspiracy case were not disproved and recommends permanent disbarment of both defendants. We are of opinion that the referee's findings of fact are in all respects amply supported by the record.

Under count 1 of the information we are only concerned whether the record on the re-reference disproves "the facts constituting the basis of the conviction" of the defendants of the offense charged, which was conspiracy to bribe.

Perhaps some of the evidentiary facts which may have been considered as proved on the conspiracy trial may be considered as disproved on the re-reference, but when it comes down to the ultimate facts constituting the basis of conviction they have not been disproved. These facts are that the defendants conspired together, arrived at a common understanding or agreement that O'Leary, who was a regional adjudication officer of the Veterans' Bureau at Milwaukee, should allow a soldier's claim pending before the Bureau; that Sullivan would get the soldier, one Morrell, to turn over to him one-half of the amount recovered for his supposed services in getting the allowance; and that Sullivan would turn over to O'Leary one-half the amount he received from Morrell. Much ado is made in the defendants' briefs that some of the testimony of witnesses upon the conspiracy trial was incorrect as to details, and that the allowance by O'Leary was proper and made in due course. But if agreement or understanding as above stated was arrived at between the defendants, it becomes entirely immaterial in these proceedings just how it was arrived at or which party made the suggestion or at just what period preceding the allowance by O'Leary the understanding was reached. It is not essential to constitute these facts that the allowance of the claim by O'Leary constituted a fraud against the United States government, or that the claim was approved by O'Leary secretly or with undue haste, which were apparently urged upon the criminal trial as facts proved therein, and which it is now argued and which it may be conceded the defendants have disproved on the re-reference.

What is the proof as to the existence of the facts stated? In the first place we have the conviction. That is presump-

tive evidence of the defendants' guilt. It is undisputed that O'Leary knew Morrell had back pay to the amount of nearly $2,500 coming to him upon an unpaid monthly allowance made eight years previously. O'Leary put Sullivan in touch with Morrell. Morrell was in jail under a thirty-day sentence as a vagrant and entirely without means. Sullivan arranged with his landlady for a room for Morrell in the apartment where he had his rooms, and kept constantly in touch with him until after the claim was allowed and payment on it received. In the meantime he advanced $70 to Morrell on expectation of allowance of the claim. O'Leary allowed the claim. A check for its payment was mailed to Morrell immediately on its approval, by registered mail. Sullivan received this letter and signed for its receipt. He took the letter to Morrell and went with Morrell to cash the check. He indorsed the check after Morrell and put the whole amount in his own checking account. He then gave Morrell a check for $1,200, and left the rest in his own checking account. Sullivan immediately drew a check to cash for $550 on this account, drew the cash thereon, and paid it over to O'Leary. O'Leary asked for cash. He did not want the payment to him made by check. He did not deposit the whole amount of the check in his bank account, but deposited only $210 thereof and kept the rest in cash. Sullivan then got Morrell to execute a power of attorney, which by its terms would authorize Sullivan to draw out the $1,200 deposited by Morrell. On Morrell's charging Sullivan with defrauding him out of the $1,200 and demanding back the power of attorney, Sullivan surrendered the power of attorney. He then gave Morrell a note for $1,200, predating it to bear the date when the government check to Morrell was deposited in his account, and within two or three days tendered $1,200 to the government official who had interested himself in Morrell's behalf, and, on his refusing to take it, paid Morrell the amount of the note. On the day

Sullivan deposited the government check the balance brought forward on his drawing account was $45.80. Sullivan's checking account was denominated "H. J. Sullivan, Trustee," and was so carried, by his own testimony, to thwart garnishment. In it he deposited his own funds and funds belonging to others without distinguishing them in any way. Morrell is a man easily influenced, practically a vagabond, with whom Sullivan formerly had some acquaintance. He did not know at the time Sullivan met him that any action had been taken on his claim against the government for compensation for disability caused by his army service, which had been allowed eight years before. Morrell's testimony, although it is impeached by his own contradictions, is to the effect that he agreed with Sullivan that Sullivan should prosecute his claim before the Bureau and receive one-half the amount recovered for his services. O'Leary signed a confession a few days after the money was paid to him in which he made statements which if true show him clearly guilty of conspiring with Sullivan to put through the claim for one-half of the one-half that Sullivan was to receive from the government. Sullivan did not testify in the criminal prosecution for conspiracy. O'Leary was called to the stand on the trial of a former case charging Sullivan with bribery and refused to testify on the ground that his answers would incriminate him. L. H. Bancroft, United States district attorney, testified that Sullivan on at least four occasions asked him to help him out of "the jam" he was in. E. J. Koelzer, assistant United States district attorney, testified that O'Leary told him that the statements contained in his confession were true,—said he was "making a clean breast of it," and wanted to get it over as soon as possible. On being told the matter would have to be presented to the grand jury, he expressed himself as wanting to go before the grand jury and "throw himself on their mercy." In a later conversa-

tion with Koelzer, O'Leary stated that an affidavit in which he repudiated the confession was false; that it was made in effort to get the government to allow a claim of his own; and that he was standing on his confession. Sullivan told Koelzer that he was going to lay his cards on the table and wanted Koelzer to get the matter fixed up; that there was no sense in his going to trial; that there was no defense he could put up, and wanted Koelzer to show him how he thought it could be dropped. O'Leary, on being questioned by an investigator of the department of which he was an officer, claimed Sullivan was his law partner; that the $550 payment by Sullivan to him was to square partnership accounts; that he frequently talked with Sullivan about Morrell's case; that he insisted Sullivan should do no illegal act, and Sullivan assured him he would not and he believed him; that Sullivan was immediately told of the allowance of the claim, and on the day following its allowance Sullivan told him that Morrell was pleased to get the money, and that he (Sullivan) could now square accounts with him. That he told Sullivan he hoped his arrangements with Morrell were gilt-edged and above board and was assured that they were. He then made no claim of working for Sullivan examining abstracts, or of loans from him to Sullivan. He claimed upon the trial that the $550 was in payment of such services and a series of small loans. No book entries were made by either Sullivan or O'Leary of charges for either services or loans. O'Leary and Sullivan both deny the charges against them and deny that they made to Koelzer the statements he claims they made. O'Leary claims his first affidavit was procured through duress, but Longfellow, who took the jurat to the affidavit and who was present when it was reduced to writing and signed, denies that any duress was used.

There is direct conflict between Koelzer and Bancroft and the defendants as to promises of immunity to O'Leary if he

would testify on the trial of the bribery charge against Sullivan. The reporter's transcript of proceedings upon the trial confirms Bancroft's testimony. Sullivan claims that he tried to testify on the conspiracy trial and was prevented from doing so and claims that Judge GEIGER, who presided at the trial, told him to sit down when he wanted to testify. The reporter's transcript affords no support for this claim.

The referee expressly finds that the defendants made to Koelzer the statements above recited, and in effect that their testimony was false where it conflicted with that of Bancroft, Koelzer, and Longfellow; that O'Leary's confession was not made under duress, and that his claim that "he became dizzy and things turned black before his eyes" when he signed is false. He expressly finds that O'Leary stated to Koelzer that the statements in his affidavit were correct. The referee expressed the opinion that the testimony taken before him "does not even tend to show that the facts which formed the basis for" their conviction are not true, and that the fact that the defendants contradicted the testimony of Bancroft, Koelzer, and Longfellow aggravates the case against them.

The acts of the defendants above stated, those involved under count 2 of the information as well as those involved under count 1, show moral turpitude and lack of morality and moral perceptions.

As to count 2, the defendants urge their inexperience and their ignorance of federal practice and their reliance upon advice of an experienced lawyer. This does not much detract from their culpability. Their conduct was a deliberate and sustained attempt to perpetrate a fraud upon the appellate and the trial courts. They either knew this, or they are entirely lacking in moral perception. The misconduct involved under this count, if it stood alone, would doubtless call for no more than disciplinary measure; but taken in connection with the misconduct involved under count 1, it is of

no little force in supporting the recommendation of the referee.

As to count 1, the conduct of the defendants denotes the same defects of moral character that this court so strongly denounced in *State v. Barto,* 202 Wis. 329, 232 N. W. 553. Here as there, there is no acknowledgment of wrongdoing, no sense of shame, no repentance. The defendants come into court asking the court to take their mere denials as of greater weight than the mass of incriminating testimony and undisputed circumstantial evidence contained in the record. They denounce as a perjurer every one who in any way contradicts their testimony, and accuse of official misconduct every officer who had to do with prosecuting them for their misconduct. O'Leary's personal appearance and bearing and his personal insistence upon his constitutional privilege against self-incrimination when called as a witness in the federal court, clearly show him not to be the weakling his claims respecting the making of his confession would make him out to be. His conflicting affidavits and his conflicting statements concerning his relations with Sullivan, depict him as disregardful of the truth and willing to say or do whatever at the moment seems likely to get him out of difficulty or work to his advantage. It is urged that O'Leary's confession is not admissible against Sullivan, and this, strictly speaking, is doubtless correct, although it is plain that if O'Leary is guilty of the conspiracy of which he was convicted Sullivan is also guilty. But if the conspiracy were considered as disproved against Sullivan, he would stand in but little if any more favorable position before the court. Upon his own claim he procured from an irresponsible vagabond $1,200 to hold as trustee for the vagabond's benefit and immediately converted nearly one-half of the amount to his own use in violation of his obligation as trustee. Whether his conversion of the $550 constituted embezzlement, we need not consider. His ignorance of his obliga-

tion as trustee, if he was so ignorant, or his disregard of it if he was not, stamp him as unfit to continue as a member of the bar. We will take no pains to distinguish between the guilt or culpability of the two defendants. We hold them both deserving of the judgment recommended by the referee. Judgment of permanent disbarment will be entered in each case.