State, Plaintiff, vs. Clarke, Defendant.

*November 7—December 2, 1952.*

■

*Harlan B. Rogers,* special counsel for the Board of State Bar Commissioners, for the plaintiff.

For the defendant there was a brief by *William J. Sheeley* of Milwaukee, attorney, and *Henry P. Hughes* of Oshkosh of counsel, and oral argument by *Mr. Hughes* and *Mr. Sheeley.*

PER CURIAM.    The defendant, Raymond Newman Clarke, is fifty-five years old, is married and has two sons, age fifteen and seventeen years. Upon his admission to the bar in 1919 he engaged in the practice of law with his father until 1936 when the latter suffered a stroke which rendered him mentally and physically incompetent until he died in 1943.

It is clear from the evidence that defendant and his father maintained a very close personal and professional relationship and that defendant was deeply grieved and distraught during his father's illness and after his death. Defendant admittedly drank excessively during that period and neglected his practice. The infractions complained of occurred during that time.

In April of 1935, defendant was appointed as trustee of a trust created by the will of Mary Ellis Killian. Assets of the trust amounted to $37,473.39, including $12,000 in federal and municipal bonds. The trust provided that the income should be paid to decedent's husband during his lifetime and, at his death, after payment of approximately one half of the trust funds to specific legatees, the remainder should be distributed to four infant beneficiaries upon their respectively attaining the age of twenty-one years, provided they had, prior thereto, taken certain religious instruction.

The husband died in 1936 and defendant converted some of the bonds into cash, from which he disbursed approximately $22,000, leaving some $17,000 to be distributed to the minor beneficiaries as they reached twenty-one.

No annual accounts were filed by the defendant until an accounting was required by the court in March, 1943. In an account filed May 5, 1943, it was shown that all the bonds had been sold. It also listed two mortgages, one executed by Robert and Pearl Keller for $4,000, and the other by Fred and Anna Sommerfeld for $3,000.

These mortgages had been placed in the account under the following circumstances: Defendant kept no separate account for the Killian trust but intermingled the funds with his own, and he drew against the account until a shortage of some $7,000 in the trust funds was created. During this same period of time defendant was coexecutor, with Frank J. Meyer, of the will of Joseph G. Meyer. The inventory of the Meyer estate filed in 1938 disclosed assets of almost $400,000 in stocks, bonds, and mortgages, including the Keller and Sommerfeld mortgages. By 1943 all of the Meyer estate had been paid out with the exception of some $36,000 of assets which were not readily salable. Up to that time defendant had been allowed $8,000 attorney's fees and he had drawn checks to himself totaling $11,000, but a final determination of fees had not been made. Since the executors desired to reduce some of the assets to cash, defendant secured the assignment of the two mortgages to himself as trustee of the Killian trust.

Defendant claimed that he was entitled to additional fees in the Meyer estate, but that Judge HANSEN's illness prevented authorization of the payment of such fees. (It is true that during this time the county judge was incapacitated.) He therefore took it upon himself to assign the mortgages to the Killian trust and thus balance his account in that trust,

considering the transfer as advance or earned fees which eventually would be allowed him in the Meyer estate.

When defendant filed his account in the Killian trust on May 5, 1943, it was not disclosed to the court that he had converted trust funds to his own use and replaced them by the transfer of the two mortgages. The court approved the account and made an allowance of $700 trustee's and attorney's fees on a petition stating that the estate had been enhanced in value $2,000 through defendant's handling of the funds, an obvious misstatement of the facts.

Thereafter the mortgages were listed in the Killian trust until 1945 when it appears that the Keller mortgage was paid. The proceeds were invested in securities and included in the Killian accounts. Although no accounts were filed in the Meyer estate during the time that these mortgages appeared in the Killian trust, it does appear that interest was collected by Frank Meyer and entered as receipts in the Meyer estate. Interest listed in the Killian trust accounts, defendant testified, were charged against himself.

On a hearing held before Judge Pattison in July of 1950, it was determined that the Sommerfeld mortgage belonged to the Killian estate and defendant paid the Meyer estate $3,000 for it. Later he paid the Killian estate $3,000 for it, and when it was paid up he owned it personally.

In 1951 the last of the minor beneficiaries in the Killian estate became twenty-one. It is conceded that all were paid the amounts to which they were entitled, and the estate was closed in August of 1951.

The three beneficiaries of the Meyer estate involved here were children of the decedent,—Frank J. Meyer, defendant's coexecutor, Mary M. Bradley, and Mathilda Allen. The hearing before Judge Pattison was brought on by order to show cause based upon the application of one or both of the sisters seeking an accounting and resignation of the executors. Mrs. Bradley and her attorney, Harvey Kaiser,

were appointed administrators with the will annexed on April 20, 1950.

On May 18, 1950, defendant filed a purported final account as executor of the estate, an account which was erroneous in many respects. The beneficiaries, being dissatisfied with such accounting, demanded an audit and asserted claims against the executors in excess of $90,000.

An auditor was appointed by the court and a partial audit made, from which it appeared that most of the claims against defendant were unfounded. It was apparent, however, that a complete accounting would require a long time and great expense, and Judge PATTISON suggested that the parties get together and agree upon a settlement. A settlement of $39,000 was reached and the bonding company paid two-thirds of that figure, $13,000 to Mrs. Bradley and $13,000 to Mrs. Allen, accepting notes from Frank Meyer and the defendant for that amount.

After the settlement was made it appeared that at least two items totaling $6,800 were erroneously included in the $39,000. In his report the referee states:

"The question can fairly be asked: Was there actually a $39,000 shortage? As above stated, two items have already reduced this figure. It is possible that a complete audit might have reduced the amount still more, if not completely liquidated this amount."

It is, however, established by the evidence that defendant converted funds of the Meyer estate to his own use. The inventory included a mortgage by Hokanson-Thompson, Inc., to the decedent appraised at $20,000, but there is testimony to the effect that it was not worth more than $13,000 or $14,000. The mortgagor quitclaimed the property directly to Frank Meyer and his sisters. In order to dispose of the real estate more profitably defendant acquired the mortgage on an adjoining lot for the three beneficiaries for

$2,300. Thereafter the entire property was sold for $28,000. After deduction of various expenses, defendant received $24,887.91 for the sale and placed it in his personal account. He deducted $95.07 from the share of each beneficiary as part payment of his commission, leaving $8,200 payable to each.

The three beneficiaries had signed a deed to the property in February, 1945, and defendant received the proceeds about March 1st. Mrs. Bradley learned of the sale in June, 1945, demanded her share, and received it. It was not until September of 1948 that Mrs. Allen learned of it and contacted the defendant. He told her the deal had not yet been closed, but she went to his office the next morning and he gave her a bank check for $8,200. Later she received $861 for interest. In April of 1949, Mrs. Allen informed her brother that the sale had been completed and when Frank Meyer demanded his share defendant paid him $5,000 cash and gave him a $3,200 noninterest-bearing note for the balance, saying that he could not finance the whole payment in cash at that time.

Judge PATTISON refused to allow attorney's fees in the Meyer estate. In testifying before the referee he stated that defendant would have been entitled to a fee of $20,000 if there had been no irregularities. He further stated that he believed the beneficiaries received all they were entitled to in the liquidation of the estate, and more, since they benefited to the extent of the fees that were disallowed.

It is not necessary to discuss in further detail the evidence which supports the separate counts set forth in the complaint. Defendant accepts the referee's findings as established, and it is our opinion that they are. The only question is whether this court should adopt the recommendations of the referee that defendant's license should not be suspended and that he should not be disbarred.

In reaching his conclusions in this matter the referee carefully considered the two elements of fitness to practice law and punishment.

· Our primary concern is whether the defendant's misconduct proves him unfit to be intrusted with the duties and responsibilities of an attorney in his relationship to the public. As stated by the referee:

"The real, the important question, to determine is this: In the public interest, is it safe to permit the defendant to practice law? In making recommendations, I have the foregoing as well as the following facts in mind: The defendant has been practicing his profession for thirty-two or thirty-three years; the misconduct charged against him is confined to the Killian and Meyer estates, both having been administered at about the same time. For over twenty years prior and since this period, the defendant has lived a normal, religious, and upright life. On this hearing and on the hearing before Judge PATTISON, he co-operated to the fullest extent in bringing about a full investigation. (Neither estate suffered a penny of loss.) Three character witnesses, all highly respected in the community, testified to his good reputation for truth and veracity and for honesty and integrity. All were of the opinion that he was fit to continue the practice of his profession."

Further, the record shows that defendant has given up drinking and has done good work, both in the district attorney's office and privately, since 1949. We agree with the referee that his usefulness as a member of the bar is not at an end. The state does not seriously contend otherwise.

So far as punishment is concerned, it is to be noted that the fees defendant earned in the Meyer estate were taken away by order of the court as a penalty for his misconduct. We believe their disallowance constitutes sufficient financial punishment of the defendant. Judge PATTISON, who went into the matter thoroughly, was of the opinion that defendant had been adequately dealt with. His testimony was as follows:

"Q. And in retrospect, do you feel that your handling of the case was sufficient punishment for Mr. Clarke? A. I

thought so, and I thought very definitely so, because I considered the matter very carefully, and I went to the bar association here in Milwaukee and told them the same thing.

"*Q*. Do you feel Mr. Clarke, either from the standpoint of learning a lesson, or from the standpoint of punishment, needs any additional discipline? *A*. No, I do not."

In considering the evidence the referee said:

". . . he received wide publicity that carries with it a stain that even time does not completely erase. All of this he brought upon himself. However, I agree with Judge PATTISON that the defendant had received sufficient punishment. I, therefore, cannot and do not recommend additional punishment by the court."

The main contention urged by the state, particularly in its oral argument before this court, is that the punishment of the defendant should be more severe than a reprimand so that other members of the bar may be restrained from engaging in similar misconduct. What has the punishment been? Defendant has lost the good practice established by his father and maintained by them both for many years. He resigned from his position in the district attorney's office in order to save embarrassment to that office. He lost substantial fees in the Meyer estate and, in addition, was required to pay $13,000 in the settlement of claims which may not have been established had a proper accounting been possible. In order to meet his obligations and maintain himself and family in his reduced circumstances, he gave up his office, sold his home and all other personal assets. He lost opportunities for other jobs.

There is no question but that considerable publicity resulted from defendant's misconduct and the investigation and hearings prior to and in connection with this proceeding, and there will likely be more at this time. We cannot see that the suspension of defendant's license to practice law will operate to deter other members of the bar from unethical con-

duct any more effectively than the knowledge of what defendant's punishment has already been.

The record shows that defendant has started to rehabilitate himself, and we know it will be a long process to again establish himself with the public as an attorney worthy of trust. There is a serious question whether the adoption of further disciplinary measures at this time would aid in that rehabilitation. Suspension would not only deprive his family of a livelihood, but would serve no more purpose as a deterrent to others contemplating an unethical course of action than the publicity which has attended the damage to defendant's reputation and financial status.

The practices engaged in by the defendant are seriously reprehensible and we do not condone them in any degree, but we are of the opinion that he has been sufficiently punished.

The findings and recommendations of the referee are adopted and the complaint is dismissed.