STATE, Plaintiff, v. ROGGENSACK, Defendant.

*January 9—February 5, 1963.*

For the plaintiff there were briefs and oral argument by *Rudolph P. Regez* of Monroe, counsel for the Board of State Bar Commissioners.

For the defendant there was a brief and oral argument by *E. J. Morse, Jr.,* of Lancaster.

Per Curiam. Rolland R. Roggensack was born September 1, 1927, and is presently thirty-five years old. He is

a graduate of the University of Wisconsin Law School, and was admitted to the bar in September, 1953. He is married and the father of three small children. Since July, 1954, he has practiced law at Lancaster, Wisconsin, where he now resides. He served as district attorney of Grant county from January 1, 1957, through April, 1961, when he was suspended by the governor because a criminal prosecution was pending against him in the Dane county circuit court for failure to file state income-tax returns for the years 1958 and 1959. Defendant waived a jury trial. He was convicted of the offense charged, viz., violation of sec. 71.11 (42), Stats.,[1] on October 12, 1961, and sentenced to pay a fine of $500.

The facts regarding defendant's failure to file his 1958 and 1959 state income-tax returns which prompted the Wisconsin department of taxation (hereinafter the "department") to institute a criminal prosecution are these: November 6, 1959, the department mailed written notice to defendant to file a 1958 return. December 9, 1959, the department mailed notice to defendant of proposed default assessment based on an estimate of his 1958 income. January 8, 1960, notice of default assessment for 1958 was sent to defendant. November 9, 1960, defendant notified by mail of hearing (at which his attendance was not compulsory) to be held at the courthouse in Lancaster to discuss possibility of his paying delinquent 1958 tax. November 14, 1960, letter was sent requesting defendant to file 1959 return and warning him of severe penalties for failure to file. This communication also commented on his failure to file 1958 return result-

---

[1] "Any person, other than a corporation, who fails or refuses to make a return at the time hereinbefore specified in each year or shall render a false or fraudulent return shall upon conviction be fined not to exceed $500, or be imprisoned not to exceed one year, or both, at the discretion of the court, together with the cost of prosecution."

ing in the default assessment for that year. December 28, 1960, notice mailed defendant requesting defendant to fill out his 1959 return and file it by January 13, 1961. Defendant made no reply to any of these communications.

Defendant testified with respect to the communications he received from the tax department as follows: In the fall of 1959 he received a form letter from the department requesting him to file his 1958 return. He laid it on his desk, which was piled high with papers, expecting to comply by filing the requested return. Shortly thereafter he received notice of a proposed doomage assessment of $400 if he did not file within ten days. He figured that his tax was around that figure and decided he would let the department have a tax lien for that amount. In the fall of 1960 he received a letter requesting a 1959 return and asking him to pay the $400 assessed for 1958. He was not as concerned about this as he should have been—perhaps in the vain hope that the department would again levy a doomage assessment as it had done in 1958.

In January or February, 1961, an auditor from internal revenue began an audit of defendant's records in which he co-operated fully. In March, while this audit was going on, defendant learned that the department had brought a criminal complaint against him. He completed his 1958 and 1959 returns and carried them to Madison and asked the department to compute the total due for tax, interest, and penalties. Not receiving a compliance with this request, he then paid the principal of the tax for the two years with interest thereon at 12 percent per annum. Thereafter, the department notified him of a 100 percent penalty.

In his testimony at the hearing before the referee, defendant told of the pressures exerted upon him and the demands made upon his time during the period of 1958–1960. In 1958 "everything happened at once." From early that year

until his suspension as district attorney in April, 1961, he was "engaged in a giant rat race." The office of district attorney in Grant county is a part-time position; Roggensack also had a growing private practice to attend to. In 1958 he commenced the probate of 21 estates—10 for the county welfare department and 11 for private clients. Several of the latter estates were sizable with respect to both amounts involved and problems presented. All of the estates handled for the welfare department involved sales of land which required that defendant clear titles to facilitate these sales.

In April, 1958, he tried an important criminal case, involving many separate counts, and also prepared a multitude of resolutions and other papers for the April meeting of the county board. The juvenile court records disclose that during these years he conducted an average of 75 hearings per year in that court. His presence was required in prosecution of traffic cases which were held in justice court in late afternoons, evenings, and Saturdays. He was driven to distraction by the constant ringing of his home phone by calls from the sheriff's office, the justice of the peace, the caseworkers in the welfare department, and lawyers whose clients had been arrested. A steady procession made its way to his office consisting of unmarried pregnant girls; village, city, county, and state police; inspectors and agents of the state government; irate businessmen waving bad checks and demanding instant action; and numerous town chairmen seeking legal advice with respect to town problems.

Civic and church activities also made demands on his time. He was president of the local Jaycee chapter and a member of the board of directors of the Community Chest. He taught a Sunday school class at his church and sang in the church choir which practiced Wednesday evenings. Furthermore, he accepted all speaking engagements extended to him. On top of everything else, he began construction of a new home in the fall of 1958 and did all the painting and varnishing himself.

Defendant summed up the effect of all these pressures and demands upon his time by stating: "I concentrated on the things requiring immediate attention and trusted to a Merciful Providence that all other matters would wait until I got to them." About May, 1958, defendant's accounting system failed him. All of his gross receipts were deposited in the bank; his only records were the deposit slips. In many cases the checks deposited included reimbursement for expenses as well as fees which rendered his task of determining net income more difficult. At the time, defendant did not become concerned because he figured that toward the end of the year he would take a week off and "reconstruct what had happened." Nevertheless, when it came time to do this he was worn out and sick in the hospital with pneumonia. When strong enough to return to work, he had to busy himself with making out the income-tax returns of his clients. Things had piled up during his sickness, and he never did find the time to straighten out his own financial records so as to file a 1958 return.

The referee's report makes reference to a pronouncement made by Judge EDWIN M. WILKIE at the time he found defendant guilty in the criminal action. In this pronouncement Judge WILKIE found that defendant failed to file returns for 1958 and 1959 with intent to get out of paying the taxes due and, in effect, to cheat the government. In commenting thereon in his report the referee states:

"From a careful review of all the proceedings had in the Dane county circuit court, I have been unable to find the slightest bit of evidence to the effect that the defendant *actually* had any criminal intent, or that any fraud or moral turpitude was involved, as that term is defined by the courts. I gather from Judge WILKIE's opinion he was of the same belief, but felt, however, that the inferences to be drawn from the defendant's neglect to respond to the reasonable requests of the department were strong enough to convict the defendant under said sec. 71.11 (42)."

On the basis of the evidence produced at the hearing before the referee, which is carefully and fully summarized in his report, the referee made this finding:

"There is no evidence whatsoever of moral turpitude as defined by the *McCarthy Case* cited [*State v. McCarthy* (1949), 255 Wis. 234, 38 N. W. (2d) 679]. I am convinced that his delinquencies were due to his own belief that having been delinquent previously, which resulted only in fines and assessments, he could repeat at a time when he was having financial difficulties by building a home, etc., without incurring more than fines and assessments to be paid when he recovered from his financial obligation. Moreover, the department makes no claim of deception, concealment, or other fraud."

Clearly on the basis of the evidence presented before the referee this finding is not against the great weight and clear preponderance of such evidence, and we adopt same. Although the referee's finding conflicts with that made by Judge WILKIE in the criminal prosecution, the latter finding is not *res judicata* in this disciplinary proceeding but merely *prima facie* evidence of moral turpitude. *State v. O'Leary* (1932), 207 Wis. 297, 241 N. W. 621, 81 A. L. R. 1193. Its effect as such *prima facie* evidence disappears by reason of our approval of this finding of the referee.

Nevertheless, the fact that defendant was not guilty of moral turpitude, in the sense of an intention to evade payment of taxes, does not relieve him from discipline. This is because defendant's failure to file income-tax returns, after being repeatedly notified by the department to do so, was intentional on his part even though he did not expect thereby to escape payment of any taxes. Canon 32 of the Canons of Professional Ethics of the American Bar Association describes the duty of the lawyer in part as follows:

"*He must also observe* and advise his client to observe *the statute law,* though until a statute shall have been construed and interpreted by competent adjudication, he is free

and is entitled to advise as to its validity and as to what he conscientiously believes to be its just meaning and extent." (Italics supplied.)

This canon was made applicable to defendant by Rule 9 of the Rules of the State Bar of Wisconsin, adopted by order of this court effective January 1, 1957, which states:

"The rules of professional conduct set forth from time to time in the Canons of Professional Ethics of the American Bar Association, as supplemented or modified by pronouncements of the court, shall be the standards governing the practice of law in this state."

The intentional violation of the tax laws is also a violation of Canon 32 of the Canons of Professional Ethics of the American Bar Association. Governments cannot operate effectively unless their revenue laws are obeyed. Such a violation of the tax laws by an attorney is a matter of serious concern because he necessarily must advise clients with respect to their obeyance of such laws. Furthermore, the legal profession is one which is peculiarly charged with the administration of our laws and therefore it is incumbent upon lawyers to set an example for others in observing the law. The intentional failure to file income-tax returns evinces an attitude on the part of the attorney of placing himself above the law. Such an attitude does not befit a lawyer. As Mr. Justice BRADLEY aptly stated many years ago in *Ex parte Wall* (1882), 107 U. S. 265, 274, 2 Sup. Ct. 569, 27 L. Ed. 552:

"Of all classes and professions, the lawyer is most sacredly bound to uphold the laws. He is their sworn servant; and for him, of all men in the world, to repudiate and override the laws, . . . argues recreancy to his position and office, and sets a pernicious example to the insubordinate and dangerous elements of the body politic. It manifests a want of fidelity to the system of lawful government which he has sworn to uphold and preserve."

Canon 29 of the Canons of Professional Ethics of the American Bar Association states that a lawyer "should strive at all times to uphold the honor and to maintain the dignity of the profession . . ."

We do not wish to imply that every violation of law by an attorney will subject him to discipline. As a general rule, before such violation will be a ground for discipline it must entail moral turpitude as defined in *State v. McCarthy* (1949), 255 Wis. 234, 249, 38 N. W. (2d) 679. Nevertheless, we deem intentional violation of tax laws, even though without intent to defraud the government, an exception to this general rule because in our opinion such intentional violation constitutes unprofessional conduct.

This brings us to the question, what discipline should be imposed upon defendant? This question should be considered with the goal of protecting the public in mind. See *State v. Barto* (1930), 202 Wis. 329, 345, 232 N. W. 553. Punishment of an offending attorney is not the objective of disciplinary proceedings. *State v. Kern* (1930), 203 Wis. 178, 181, 233 N. W. 629. Primary consideration should be given to the question of whether there is a likelihood, if any discipline is imposed short of suspension or disbarment, of the attorney's engaging in unprofessional conduct in the future. *State v. Markey* (1951), 259 Wis. 527, 542, 49 N. W. (2d) 437; *State v. McCarthy, supra,* at page 250; and *State v. Kern, supra,* at page 183. On this point, the referee was much impressed, as is the court, by the testimony given in behalf of defendant by Judges ORTON and FRANTZ.

Judge RICHARD W. ORTON has been circuit judge of the Fifth circuit since 1955. He resides in Lancaster which also is defendant's place of residence. Judge ORTON testified that he had known defendant for twenty-five years and described him as a "capable, able, diligent young lawyer whose ethics in my opinion, and whose moral standards and integrity are beyond question." Judge ORTON stated that he is convinced

that defendant "can in the future practice law without the remotest possibility of any harm coming to any client or clients, or to the public, and to me that is the ultimate test in a case of this kind." After defendant's conviction in the criminal action, Judge ORTON joined in appointing defendant as family court commissioner of Grant county because the judge was convinced defendant was the kind of man wanted for the job.

Judge GEORGE F. FRANTZ retired from the bench on July 31, 1961, after serving fifteen years as the county judge of the county court of Grant county. Judge FRANTZ testified in part as follows:

"I became acquainted with him, as I knew him through his practice . . . as district attorney. . . . [H]e was in my court or in my chambers two or three times a day.

"He was an excellent district attorney. He was never derelict in his duty. . . . I had explicit confidence in him."

In response to the question, "[D]o you feel he is fit at this time to continue the practice of law?"—Judge FRANTZ answered, "Absolutely."

We are completely satisfied that the discipline of suspension is not required in order to protect the public against any future acts of unprofessional conduct by defendant, and that he possesses the good moral character necessary for continuance of the practice of law.

This brings us to the question of whether a suspension is necessary as a restraining influence upon other attorneys who may also contemplate failing to file income-tax returns. Just as a decision to impose discipline involves "to some extent a punishment," which, however, is not the "primary consideration" in disciplinary proceedings (*State v. Barto, supra,* at pages 344, 345), so too does a decision to impose discipline interpose to some extent an element of deterrence to others. *In re Stolen* (1927), 193 Wis. 602, 623, 214 N. W. 379, 216 N. W. 127. If, however, the extensive newspaper publicity

covering every phase of defendant's criminal prosecution and conviction, the fine imposed in that action, his suspension from office as district attorney, the adverse effect of such suspension upon his candidacy in a judicial election held April 4, 1961, and the reprimand of this court are not sufficient deterrents to other attorneys, we doubt that suspension from practice would be any more effective. *State v. Clarke* (1952), 262 Wis. 594, 602, 55 N. W. (2d) 888.

The referee relied heavily on the precedent of *State v. McKinnon* (1953), 263 Wis. 413, 57 N. W. (2d) 404, in recommending dismissal of the instant proceedings. The unprofessional conduct charged in the *McKinnon Case* was likewise failure to file state income-tax returns. This court held therein that although the attorney was subject to censure for failure to file the returns, it was not within the scope of this court's authority to impose discipline. The court stated (p. 416):

"Defendant's conduct may show an inexcusable lack of moral sense regarding the discharge of his obligations as a private citizen to his government, but it is not within the scope of this court's authority to impose discipline for conduct which has no relation to his duties and obligations as a lawyer, where the request for disciplinary action is based upon acts involving no moral turpitude."

This foregoing language clearly conflicts with the instant opinion and thus is hereby overruled.

It is ordered and adjudged, that defendant be reprimanded for his conduct in failing to file his 1958 and 1959 state income-tax returns, and that he pay the costs and expenses of these proceedings, but not to exceed a maximum of $750. Such costs and expenses shall include the fees and disbursements of the referee, the fees and disbursements of the attorney for plaintiff, the fees of the official reporter, the fees of the clerk of this court, and the cost of printing plaintiff's brief and appendix.

HALLOWS, J. (*dissenting in part*). The majority opinion holds in effect this court has power to revoke or suspend a license of a member of the bar for acts in his private life which do not involve unprofessional conduct or moral turpitude and overrules language in *State v. McKinnon* (1953), 263 Wis. 413, 416, 57 N. W. (2d) 404, that "it is not within the scope of this court's authority to impose discipline for conduct which has no relation to his duties and obligations as a lawyer, where the request for disciplinary action is based upon acts involving no moral turpitude." It was pointed out in *State v. McCarthy* (1949), 255 Wis. 234, at page 246, 38 N. W. (2d) 679, that sec. 256.28 (8), Stats., provides for a special proceeding relating to the suspension and disbarment of attorneys and, under sec. 256.28 (7), a lawyer found guilty of unprofessional conduct or an act involving moral turpitude may be suspended or disbarred from practice, but no other penalty is provided.

The majority opinion's expression of this court's power is apparently based upon the inherent power of this court to discipline and disbar attorneys. Such power is recognized in *In re Stolen* (1927), 193 Wis. 602, 214 N. W. 379. But inherent power is not unlimited or founded upon *ipse dixit*. By overruling the language of the *McKinnon Case,* the majority opinion leaves a clear implication that regardless of the statute this court has the power and jurisdiction to disbar or suspend an attorney for acts not amounting to unprofessional conduct or not involving moral turpitude. The majority opinion expresses a dangerous doctrine of inherent power and only softens its impact by stating as a general rule it will not exercise such power but there may be exceptions.

I quite agree that on the instant facts the defendant should be censured for his conduct which did not involve unprofessional conduct as defined in sec. 256.29 (2), Stats., or moral turpitude. But I have difficulty with the concept that every violation of the law is unprofessional conduct because

the Canons of Ethics provide an attorney should obey the law. I do not think this court's inherent power goes to the extent of disbarring or suspending an attorney for his private life or his morals which do not amount to a breach of professional conduct or involve moral turpitude. I agree with what we said in the case of *In re Richter* (1925), 187 Wis. 490, 504, 204 N. W. 492: "This court does not sit in this or any other case as a court of inquisition to search out the private life and censor the morals of the attorneys who are its officers." I must respectfully dissent.

I am authorized to state Mr. Justice DIETERICH joins in this dissent.