STATE, Plaintiff, v. WILDERMUTH, Defendant.

*February 3—March 3, 1967.*

236

For the plaintiff there was a brief and oral argument by *Rudolph P. Regez* of Monroe, counsel for the Board of State Bar Commissioners.

For the defendant there was a brief and oral argument by *George E. Frederick* of Milwaukee.

PER CURIAM. This inquiry probed much of the defendant's professional conduct since 1958. The scope of the inquiry and the gravity of the misconduct are best described by reviewing each charge and the referee's findings thereon.

### Count I.

Defendant was found guilty of commingling the funds of his clients with his personal funds in two specific instances. In the Carey J. Carey Estate defendant received a check for $1,419.50 on August 27, 1962, to be used to pay certain estate bills including the decedent's funeral expenses. This funeral bill was not paid until May, 1965, and not until substantial pressure had been exerted by Attorney Henry Hughes, who had been retained by the executor. During this extended period of time, defendant's trust account was either below the aggregate amount of the check or overdrawn on several occasions. On this matter the referee also found defendant guilty of inexcusable neglect in caring for this client's business.

In the Lois Barnes matter, Mrs. Barnes retained defendant to assist her in selling a business, and deposited nearly $19,000 in defendant's trust account to be used to satisfy creditors under the Bulk Sales Act. Insufficient sums were retained in the trust account to pay the amount due Mrs. Barnes from January 2, 1965, through March 2, 1965, and a check in the amount of $2,709.86 was returned by the bank but was made good the next business day. The referee found that "this act constituted gross mishandling of the trust account."

As to defendant's trust account problem, Ralph R. Root, a certified public accountant, made the following observations:

"1. Account has never been reconciled.
"2. Frequently the account was actually overdrawn.

"3. Business, personal, and trust account receipts and disbursements have been intermingled, hence an audit of the trust account only does not encompass all trust receipts and disbursements.

"4. C. K. Wildermuth has deposited his own funds in the trust account, as well as withdrawing for personal use.

"5. Many trust disbursements were not properly accounted for, . . .

"  . . .
"  . . .

"6. Further confusion arose due to lack of coordination between the two other persons making deposits and disbursements to this account."

In summary, Root testified that this confusion was due to the carelessness and inefficiency of the defendant. There is no evidence that defendant converted these funds to his own use or that any loss was suffered by any of his clients because of the trust fund mismanagement.

### Count II.

On October 19, 1960, defendant received $740 from John Astrach to be used to pay taxes for Mr. Astrach. Mr. Astrach died and defendant represented to his widow that the taxes had been paid. Mrs. Astrach discovered that the taxes had not been paid and she retained Attorney Eugene Bitters to press the matter. After representing to Attorney Bitters that the taxes had been paid, defendant finally paid the taxes on October 31, 1962. The referee found the defendant guilty of commingling this money with his own.

### Count III.

On December 19, 1960, defendant was retained to terminate a joint tenancy following the death of Frank

R. Krall. He delivered to Mrs. Krall a copy of a proposed order terminating the joint tenancy. Mrs. Krall's daughter testified that Mrs. Krall had paid defendant $60 for these services. The matter was not completed, however, until defendant was contacted by Judge WILLIS two and a half years later. The trial judge found unprofessional neglect in this act of misrepresenting that the work was done and accepting pay before completion.

## *Count IV.*

This count alleges dilatoriness, neglect and carelessness in the handling of over 30 estates. In many instances there was an unwarranted delay in closing estates. In some instances defendant took up to eight years for a closing. However, defendant was not dilatory in taking his fee from the estate before the matter was closed. In almost every case he took a fee substantially before the final accounting. Defendant was cited for contempt in several estates and an order to show cause was issued in others. In most of these cases defendant paid the increased taxes and interest caused by his delay. In some matters, however, the penalty was so large that defendant was not able to pay it, although he has promised to do so. In two estates,[1] if defendant is unable to pay these sums, his clients will be liable for them and will suffer as a result.

## *Count V.*

Defendant was charged with misrepresenting to a client for whom he was doing substantial probate work and from whom he was obtaining a loan that his house, offered as security for the loan, was free from any encumbrance when, in fact, it was mortgaged. The evidence adduced did not support this charge and the referee

---

[1] Tom Eagen and Howard Eggleston Estates.

found that the defendant was not guilty of fraud or deceit in the matter. The referee did find, however, that the defendant used poor judgment in securing a loan from his client and was guilty of overreaching by collecting a fee of $5,340 before he had completed the estate work.

The referee made a general finding as follows:

"In general, I find the Defendant to be capable, free from fraudulent and deceitful practice; extremely careless, given to procrastination, and indifferent to his responsibilities to his clients; unresponsive to the requests and demands of the courts and Grievance Committee and clients for reports.

"I further find that overwork, and at times ill health, contributed to the unsatisfactory manner in which so many of his matters were conducted; that the inevitable and unsatisfactory results of such irresponsible conduct constituted a reflection on the good name of the legal profession, and at times did irreparable damage to its reputation."

There is no question but what defendant has been guilty of gross professional misconduct. The referee declared that it was almost incomprehensible that in the relatively short time between 1950 when the defendant opened his practice in Berlin to the time of these proceedings there could arise complaints in 38 matters which were considered serious enough to be embraced in the present complaint.

Defendant has led at least one client to believe work was done when it was not. Defendant has carelessly controlled his trust account and his own funds so that three instances of commingling were found. There have been many estates where he has inexcusably dragged the closing well past the point at which he took his final fee.

Yet we are impressed by the showing of rehabilitation. During the proceedings evidence was adduced to show that all probate matters were current except for the

two where a late payment of inheritance tax must still be made. The referee concluded that the defendant "was displeased with his unprofessional conduct, and that if given another chance he would proceed to practice his profession to his credit and that of the legal profession." Defendant has decreased the volume of his work.

There is nothing in the record to show any deviousness, fraud or deceit in the handling of any of the matters in question or otherwise. No moral turpitude or criminal conduct was involved. The character witnesses for the defendant all testified that he was an honest, capable lawyer.

The factors to be considered in imposing discipline have recently been summarized in *State v. Roggensack:* [2]

"This question should be considered with the goal of protecting the public in mind. See *State v. Barto* (1930), 202 Wis. 329, 345, 232 N. W. 553. Punishment of an offending attorney is not the objective of disciplinary proceedings. *State v. Kern* (1930), 203 Wis. 178, 181, 233 N. W. 629. Primary consideration should be given to the question of whether there is a likelihood, if any discipline is imposed short of suspension or disbarment, of the attorney's engaging in unprofessional conduct in the future. *State v. Markey* (1951), 259 Wis. 527, 542, 49 N. W. (2d) 437; *State v. McCarthy, supra,* at page 250; and *State v. Kern, supra,* at page 183."

Defendant's conduct has been thoroughly unprofessional. Although the court is impressed by the degree of defendant's rehabilitation, we nevertheless conclude that the imposition of a suspension is necessary to guard against the likelihood of other attorneys engaging in similar misconduct and as a punishment to the defendant for his gross failure to conduct his affairs in a professional manner. In this respect the referee stated:

"In my judgment the number of delinquencies and misconduct referred to in the Findings is so numerous,

---

[2] (1963), 19 Wis. (2d) 38, 46, 119 N. W. (2d) 412.

and some so utterly inexplainable and serious that nothing short of a suspension of some length would offer sufficient recognition of the seriousness of the unprofessional conduct or protect the public from such conduct from others, to discourage attorneys from allowing themselves to fall into similar inexcusable slovenly and un-lawyer-like practices."

As we said in *State v. Kern:* [3]

". . . disciplinary measures should be at least co-extensive with an effective judicial disapproval of the confessed misconduct, . . ."

Although there has been no showing of criminal conduct or fraud or deceit, there nevertheless has been conclusively established such repeated acts of professional misconduct so that a suspension is called for. Because of the substantial rehabilitation that has already been accomplished, and the plaintiff's own recommendation that the suspension be for a lesser period than the one year recommended by the referee, we conclude that the suspension should be for a period of six months rather than for one year as recommended by the referee. The defendant shall also pay $3,000 toward all costs of these proceedings.

The referee has recommended that although the defendant be suspended, in order that "innocent clients will not suffer," the defendant should be allowed to complete the unfinished matters now pending with his clients. We cannot accept this recommendation for the reason that if the defendant is to be suspended he cannot very well be practicing law for some, whereas he is completely suspended in general. We conclude, therefore, that his suspension should be complete except for the Tom Eagen and Howard Eggleston Estates, which we have reviewed before and which have been or are in the process of actual completion.

---

[3] (1930), 203 Wis. 178, 182, 233 N. W. 629.

It is ordered and adjudged that the license of the defendant, Charles K. Wildermuth, to practice law be suspended for a period of six months from the date of entry of this order and thereafter until reinstatement; that within six months from the date of the entry of judgment herein, or prior to that time, the defendant shall satisfy the court that the Tom Eagen and Howard Eggleston Estates have been concluded without financial loss to the heirs; that the costs of this proceeding shall be taxed and charged to the defendant to the extent of no more than $3,000 and collected in accordance with the provisions of sec. 256.28 (14), Stats., said payment to be due and payable within one year from the date of the entry of judgment herein; that after the expiration of six months the defendant may apply for reinstatement of his license to practice law upon compliance with sec. 6, rule 10, State Bar Rules; that the State Bar of Wisconsin notify the courts of record of this state of this order by sending each a copy of this order; that the defendant notify each client now represented by him in any matter involving the practice of law or any matter pending in any court of this state, except for the two estates hereinbefore specified, that he is suspended from the practice of law in this state and can no longer represent him during the period of suspension.